**Richard TOBIAS, Appellant,**

v.

**The UNIVERSITY OF TEXAS AT ARLINGTON, W.H. Nedderman, Myrna Pickard, and Elaine Gebhardt, Appellees.**

No. 2-90-233-CV.

Court of Appeals of Texas, Fort Worth.

Dec. 11, 1991.

Publication Ordered Jan. 15, 1992.

Rehearing Overruled Jan. 15, 1992.

OPINION

LATTIMORE, Justice.

This is an appeal from a summary judgment rendered in favor of appellees, defendants below, in a case brought by appellant based on the receipt of a failing grade in a nursing course.

We affirm.

### Statement of Facts

Appellant, Richard Tobias, brought this action against the University of Texas at Arlington ["University"] and the following officials of the school, individually and in their respective official capacities: Dr. W.H. Nedderman, President of the University; Myrna Pickard, Dean of the School of Nursing; and Dr. Elaine Gebhardt, Professor of Nursing. In his original petition, filed September 4, 1986, appellant alleged denial of his due process and equal protection rights under the Texas Constitution and breach of contract. Based on these claims, appellant sought: (1) injunctive relief against all defendants; (2) money damages of at least $100,000 against all defendants; and (3) punitive damages of at least $300,000 against appellee Elaine Gebhardt. In a supplemental petition filed July 3, 1989, appellant alleged denial of his due process and equal protection rights under the United States Constitution. Appellant sought money damages for these alleged wrongs.

Appellees filed an original motion for summary judgment on June 26, 1989, and a supplemental motion for summary judgment on July 13, 1989, on the grounds that: (1) appellees were immune from suit under the doctrine of sovereign immunity; (2) there was no violation of appellant's due process or equal protection rights; (3) the college catalog did not create a contract; and (4) the individual appellees were immune under the doctrine of quasi-judicial liability.

On September 22, 1986, the trial court held a hearing on appellant's request for a temporary injunction. At the close of the hearing, the court denied the temporary injunction. Although there is some confu-

Douglas R. Larson, Mesquite, for appellant.

Dan Morales, Atty. Gen. of Texas, Will Pryor, First Asst. Atty. Gen., Mary F. Keller, Executive Asst. Atty. Gen., James C. Todd, Chief, Gen. Litigation Div. and Joe Bridges, Asst. Atty. Gen., Austin, for appellees.

Before FARRIS, LATTIMORE and MEYERS, JJ.

sion as to the exact date, the record indicates that the trial court held a hearing on appellees' motions for summary judgment in 1990. In an order dated July 24, 1990, the trial court rendered judgment for appellees.

The record indicates that appellant enrolled in the University in the Spring of 1982 seeking an undergraduate degree in nursing. As a part of the curriculum for the nursing degree, appellant was required to take Nursing 4541—Nursing During the Childbearing Experience. Appellant enrolled in Nursing 4541 in the Spring of 1984 with Professor Gebhardt. As a part of the clinical aspect of the course, appellant was required to submit a nursing process. Appellant described a nursing process as a "long paper in which you identify a patient's problem and then plan your interventions and set your goals in order to help the patient resolve this problem, and proceed towards a more healthy state."

Dr. Gebhardt stated that she spent a lot of time explaining the process paper requirements to appellant. During the course of the class, she noticed that appellant was able to collect data but was unable to apply problem solving or decision making techniques to the data. Appellant did not have his paper completed when initially due, so Dr. Gebhardt gave appellant additional time within which to complete the assignment. Dr. Gebhardt stated that on the last day the papers were due, appellant came to her office with a stack of copied notes, charts, and medical records. Although these papers represented the data appellant had collected, appellant had failed to complete the nursing process. Dr. Gebhardt stated that appellant handed her the stack of papers and told her he wanted her to do the paper because appellant had already collected the data.

Dr. Gebhardt felt that appellant deserved a failing grade because of his inability to complete the nursing process. Before making a final decision, however, Dr. Gebhardt submitted appellant's work to Susan Baxley for a second opinion. After seeing the grade Susan Baxley assigned the pa-

per, Dr. Gebhardt presented the situation to her supervisor, Dr. Wyers. Dr. Wyers assigned the paper to Dr. Susan Grove for review purposes. Both reviewers recommended that appellant receive a failing grade for his work.

After appellant received a failing grade for Nursing 4541, he availed himself of the University's grade grievance procedures. The University catalog provides that:

### GRIEVANCE RELATED TO GRADES

In attempting to resolve any student grievance regarding grades, it is the obligation of the student first to make a serious effort to resolve the matter with the individual with whom the grievance originated. Individual course instructors retain primary responsibility for assigning grades. The instructor's judgment is final unless compelling evidence shows discrimination, differential treatment, or procedural irregularities. If evidence warrants appeal, the normal academic channels are these: department chairman or program director, academic dean, Vice–President for Academic Affairs, President. However, before considering a grievance, the department chairman or program director may refer the issue to a departmental or school committee of faculty and students. If the committee cannot reach a solution acceptable to the parties involved, the matter will follow the remaining academic channels.

There is nothing in the record to indicate what steps were taken by appellant to resolve this problem with Dr. Gebhardt.

The record does reflect that appellant appealed his failing grade to Myrna Pickard, Dean of the School of Nursing. Dean Pickard held conferences with appellant and appellant also wrote letters to her. Appellant contended that Dr. Gebhardt failed him because she believed that appellant had made an obscene phone call to her. At the meetings with Dean Pickard, appellant was allowed to explain his side of the situation. Dean Pickard also contacted two students from appellant's clinical group to see if they had noticed any discriminatory treatment of appellant by Dr. Gebhardt. The two students indicated that they had

not noticed any such treatment. Dean Pickard also contacted several nurses at the hospital where appellant did his clinical work, and they also stated that appellant received the same treatment as any other student. Finally, Dean Pickard reviewed appellant's work and indicated that she would not have been able to pass a student based on the work she reviewed. In a letter to appellant dated June 20, 1984, Dean Pickard denied appellant's appeal for a change in his grade. She did offer to assist appellant in writing nursing processes.

On July 2, 1984, Dean Pickard denied a subsequent request to reconsider stating that she had reviewed the evaluations of appellant's paper and supported the instructor's decision as to appellant's grade. On July 24, 1984, Dean Pickard denied a request from appellant to take courses out of sequence.

W.A. Baker, Vice President for Academic Affairs, was the next person to review appellant's appeal for a grade change. In a letter dated August 24, 1984, W.A. Baker informed appellant that he had reviewed the materials submitted by appellant and discussed the case with Dean Pickard. W.A. Baker denied appellant's appeal stating that he failed to find any "substantive evidence of discrimination, differential treatment or procedural irregularities." On August 29, 1984, W.A. Baker denied appellant's request to take courses out of sequence.

In a letter dated August 31, 1984, W.H. Nedderman, President of the University, informed appellant that he had reviewed the documentation provided by appellant and had discussed appellant's case with others. Based on this review, appellant's appeal was denied. Following a letter from appellant and a meeting on September 6, 1984, President Nedderman informed appellant, in a letter dated October 5, 1984, that his appeal had been given appropriate attention and he was therefore denying appellant's request to reconsider.

Appellant again enrolled in Nursing 4541 in the fall of 1984 with Susan Baxley as the instructor. Susan Baxley noticed that appellant had some difficulty with patient assessment and carrying out patient care without supervision. Appellant also had difficulty communicating with and supporting patients. Susan Baxley also noticed that appellant had difficulty in completing the nursing process requirement. Although appellant could collect the required data, he was unable to take the information and prepare an articulable plan for himself or others to use. In addition, appellant would collect data that was not relevant to the particular situation. Although appellant was allowed to redo the required papers several times, he ultimately failed Nursing 4541 a second time.

Appellant appealed the second failure to Associate Dean Mary Wyers. In a letter dated January 9, 1985, she informed appellant that based on her review of the situation she could find no compelling evidence to support intervention.

Dean Pickard was the next person to review appellant's appeal of his grade. On January 10, 1985, she informed appellant that her review indicated no basis for recommending a change in the grade received by appellant.

W.A. Baker, Vice President for Academic Affairs, also reviewed appellant's appeal for a grade change. Based on his review of the appeal, discussions with Dean Pickard, and appellant's failure to present sufficient evidence of discrimination, differential treatment, or procedural irregularity, W.A. Baker denied appellant's appeal on January 11, 1985. On January 15, 1985, after considering the case, President W.H. Nedderman also denied the appeal.

On the same day, Vice President Baker denied appellant's request to enroll in courses for which Nursing 4541 was a prerequisite. On February 26, 1985, Dean Pickard informed appellant that since he had failed Nursing 4541 twice, he would not be eligible to graduate from the School of Nursing. On March 5, 1985, Dean Pickard denied appellant's request to take Nursing 4541 a third time at another school for transfer purposes.

James P. Duncan, Executive Vice Chancellor for Academic Affairs for The Univer-

sity of Texas System, also reviewed appellant's claims in response to letters appellant sent to members of the Board of Regents. In a letter dated July 22, 1985, James Duncan informed appellant that after reviewing appellant's contentions and discussing the case with personnel from the University, he found no error in the grades received or in the appellate procedure used to review the grades. The letter closed with the following: "Based upon the information available to me, which is summarized herein, I am convinced that you were accorded every available consideration with regard to your grade in Nursing 4541 and that there is no basis for pursuing this matter further."

On September 3, 1985, James Duncan sent another letter to appellant stating that The University of Texas System Administration, and in particular the Office of the Chancellor and the Board of Regents, did not have an established procedure for reviewing grades received by a student at one of the component universities. Citing his previous letter, James Duncan told appellant that as far as The University of Texas System was concerned, the matter was closed.

Appellant continued to seek review of his grades. James L. Crowson, General Counsel for The University of Texas System, was the next person to respond to appellant. In a letter dated September 23, 1985, James Crowson again informed appellant that The University of Texas System considered the matter closed.

Finally, appellant sent a letter to Hans Mark, Chancellor of The University of Texas System. In a letter dated January 10, 1986, Chancellor Mark expressed his puzzlement at appellant's indication that he planned to name Chancellor Mark as a defendant in a lawsuit. Chancellor Mark stated in his letter that Francie Frederick from the Office of General Counsel had reviewed all of appellant's letters and other information and had advised Chancellor Mark that appellant had been afforded the full benefit of the University grade grievance procedure and had otherwise been treated fairly. In closing, Chancellor Mark

informed appellant that it was not appropriate for him to intercede in the admissions process at the University nor to recommend that appellant be given permission to take Nursing 4541 for a third time at some other school.

After appellant's exhaustive attempts to have his grades changed or to be allowed to take the course a third time failed, appellant filed his lawsuit.

### Appellant's Points of Error

■ Appellant's first point of error complains of the trial court's failure to submit written findings of fact and conclusions of law after they were requested by appellant. Both sides in this appeal have briefed the question of whether appellant's motion for new trial extended the time in which appellant could timely request findings of fact and conclusions of law. We need not address this point.

This is an appeal from a summary judgment. "Findings of fact and conclusions of law have no place in a summary judgment proceeding." *Starnes v. Holloway,* 779 S.W.2d 86, 90 (Tex.App.—Dallas 1989, writ denied); *see also State v. Easley,* 404 S.W.2d 296, 297 (Tex.1966). Appellant was not entitled to have any findings of fact or conclusions of law filed by the trial court. Appellant's first point of error is overruled.

Appellant's second point of error contends the trial court erred in granting appellees' motion for summary judgment because the court failed to recognize that federal and state law requires that a hearing is necessary regarding a student's grades at a public university.

In briefing this second point of error, appellant has provided a lengthy analysis of the following areas of law: (1) 42 U.S.C.S. § 1983 (Law.Co-op.1986) cases in state court; (2) the availability of attorney's fees in section 1983 cases against state officials; and (3) the liability of state officials for acts not lawfully authorized.

■ While we do not necessarily disagree with appellant's presentation of the law concerning these subjects, we find that appellant has failed to present any authori-

ty relevant to his complaint on appeal. Since the appellant failed to present any authority to maintain the point at issue, error, if any, has been waived. TEX. R.APP.P. 74(f). Appellant's second point of error is overruled.

Appellant's third point of error complains that the trial court erred in granting appellees' motion for summary judgment because the trial court failed to recognize appellant's due process rights. In this point of error, appellant presents arguments relating to substantive due process, procedural due process, and a contract claim.

■ In a summary judgment case, the issue on appeal is whether the movant met his burden for summary judgment by establishing that there exists no genuine issue of material fact and that he is entitled to judgment as a matter of law. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979); TEX.R.CIV.P. 166a. The burden of proof is on the movant, and all doubts as to the existence of a genuine issue as to a material fact are resolved against him. *Great American R. Ins. Co. v. San Antonio Pl. Sup. Co.*, 391 S.W.2d 41, 47 (Tex.1965). Therefore, we must view the evidence in the light most favorable to the nonmovant. *See id.* In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence will be disregarded and the evidence favorable to the nonmovant will be accepted as true. *Montgomery v. Kennedy*, 669 S.W.2d 309, 311 (Tex. 1984); *Farley v. Prudential Ins. Co.*, 480 S.W.2d 176, 178 (Tex.1972). Every reasonable inference from the evidence must be indulged in favor of the nonmovant and any doubts resolved in his favor. *Montgomery*, 669 S.W.2d at 311. Evidence which favors the movant's position will not be considered unless it is uncontroverted. *Great American*, 391 S.W.2d at 47. If such uncontroverted evidence is from an interested witness, it cannot be considered as doing more than raising a fact issue, unless it is clear, direct, positive, and free from inconsistencies and contradictions. *Id.; see also Beaumont Enter. & Journal v. Smith*, 687 S.W.2d 729, 730 (Tex.1985); *Americana Motel, Inc. v. Johnson*, 610 S.W.2d 143 (Tex.1980) (per curiam) (affirming a summary judgment based solely upon the uncontroverted testimony of an interested party). The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of his cause of action or defense as a matter of law. *City of Houston*, 589 S.W.2d at 678.

Appellant contends in his brief that his grade problems stem from several factors: (1) Elaine Gebhardt refused to accept a valid excuse for a class absence; (2) Gebhardt believed that appellant had made an obscene phone call to her; (3) Gebhardt refused to meet with appellant on six occasions to discuss his paper; and (4) arbitrary criteria was applied to the grading process. In addition to these problems, appellant points to several factors he claims existed which caused the appeals process to be deficient: (1) the review of appellant's work by Baxley and Grove was done without appellant's knowledge or input; (2) appellant was not allowed to present evidence nor was any testimony elicited at his hearing with Dean Pickard; (3) administration officials had communications about appellant in appellant's absence; (4) there was no review of the subjective basis for appellant's grade; (5) appellant was not allowed to call witnesses; and (6) appellant was never actually given a "hearing".

Before reaching the substance of appellant's claims, we begin by setting out the appropriate standard of review in cases involving academic decisions. The Supreme Court of the United States has noted that "[c]ourts are particularly ill-equipped to evaluate academic performance" and warned against any judicial intrusion into academic decision making. *Bd. of Curators of University of Mo. v. Horowitz*, 435 U.S. 78, 92, 98 S.Ct. 948, 956, 55 L.Ed.2d 124, 136 (1978). In the same opinion, Justice Powell remarked that "[u]niversity faculties must have the widest range of discretion in making judgments as to the academic performance of students." *Id.* at 96 n. 6, 98 S.Ct. at 958 n. 6, 55 L.Ed.2d at 139 n. 6 (Powell, J., concurring).

The decision of an individual professor as to the proper grade for a student in a particular course requires an expert evaluation of cumulative information and is not readily adapted to the tools of judicial decision making. *See id.* at 90, 98 S.Ct. at 955, 55 L.Ed.2d at 135. In *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the United States Supreme Court refined the "narrow avenue for judicial review" of academic decisions:

> When judges are asked to review the substance of a genuinely academic decision ... they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Id.* at 225, 106 S.Ct. at 513, 88 L.Ed.2d at 532 (footnote omitted). The Court cited to a lack of standards, a reluctance to "trench on the prerogatives" of educational institutions, and the Court's responsibility to safeguard academic freedom as reasons for the constrained review. *Id.* at 226, 106 S.Ct. at 514, 88 L.Ed.2d at 533. The Court concluded that courts are ill-suited to evaluate the substance of the multitude of academic decisions made on a daily basis by the faculty members of educational institutions. *See id.*

### Due Process

■ We first address appellant's contention that there was a violation of his due process rights. Due process not only accords procedural safeguards to protected interests, but also protects substantive aspects of those same interests against impermissible governmental restrictions. *See Harrah Indep. School Dist. v. Martin,* 440 U.S. 194, 197, 99 S.Ct. 1062, 1063, 59 L.Ed.2d 248, 253 (1979) (per curiam).

■ We begin with the procedural due process question. Procedural due process requirements apply only to the deprivation of interests encompassed by the fourteenth amendment's protection of liberty and property. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548, 556 (1972); *see also Spring Branch I.S.D. v. Stamos,* 695 S.W.2d 556, 560 (Tex.1985) (strictures of due process apply only to deprivation of interests protected by federal and state constitutions), *appeal dismissed,* 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986). The range of interests granted this protection is not infinite. *Roth,* 408 U.S. at 570, 92 S.Ct. at 2705, 33 L.Ed.2d at 557. In determining whether due process requirements apply in the first place, this court must look to the nature of the interest at stake to determine if the interest is within the constitution's protection of liberty and property. *See id.* at 570–71, 92 S.Ct. at 2705–06, 33 L.Ed.2d at 557.

In the present case, appellant contends that he has a property right in his grades. Specifically, appellant contends that since the University created a catalogue and made it enforceable, appellant "clearly has property rights relative to the appeal process relative to his grades." As appellant has claimed no liberty interest, we will direct our attention only to his claimed property interest.

■ The procedural protection of property safeguards the security of interests that an individual has already acquired in specific benefits. *Id.* at 576, 92 S.Ct. at 2708, 33 L.Ed.2d at 560. In order to have a property interest in a benefit, the individual must have more than some abstract need or desire for that benefit. There must be more than a mere unilateral expectation to the benefit. Indeed, the individual must have a legitimate claim to the benefit. *Id.* at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 561. Property interests are not created by the Constitution. *See id.* A property interest must find an origin in an independent source, such as some aspect of state law. *See id.; Stamos,* 695 S.W.2d at 561.

As authority for his contention that he has a property interest in his grades, appellant cites this court to the case of *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). In *Ewing,* a university student

brought suit against the regents of the university challenging the constitutionality of his dismissal from a program leading to a medical degree. *Id.* at 215, 106 S.Ct. at 508, 88 L.Ed.2d at 526. The student contended that he had a property interest in the program and his dismissal was arbitrary and capricious and resulted in a violation of his substantive due process rights. *Id.* at 217, 106 S.Ct. at 509, 88 L.Ed.2d at 527.

The Court first recognized their earlier opinion in *Horowitz* where they had assumed, without actually deciding, that courts can review an academic decision under a substantive due process standard. *Id.* at 222, 106 S.Ct. at 511, 88 L.Ed.2d at 530. The Court went on to recognize Justice Brandeis' admonition that they should not formulate any rule of constitutional law broader than was required given the facts of the case to which the rule was to be applied. *Id.* at 222, 106 S.Ct. at 512, 88 L.Ed.2d at 530 (citing *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688, 711 (1936)). The Court decided that the facts of the case before them afforded a basis for decision that did not require them to decide whether the student did in fact have a property right in continued enrollment. *See id.* 474 U.S. at 222–23, 106 S.Ct. at 512, 88 L.Ed.2d at 530–31.

> We therefore accept the University's invitation to "assume the existence of a constitutionally protectible property right in [Ewing's] continued enrollment," and hold that even if Ewing's assumed property interest gave rise to a substantive right under the Due Process Clause to continued enrollment free from arbitrary state action, the facts of record disclose no such action.

*Id.* at 223, 106 S.Ct. at 512, 88 L.Ed.2d at 530–31 (footnote omitted).

The *Ewing* decision does not stand for the proposition that appellant does in fact have a property interest in his grade or in the appeal process relative to grade grievances. As Justice Powell pointed out, Ewing's claim to a property right was dubious

at best. *Id.* at 229, 106 S.Ct. at 515, 88 L.Ed.2d at 534 (Powell, J., concurring).

As did the Court in *Ewing*, we find that the facts of the present case afford the most appropriate basis for our decision. Although we have serious doubts as to a constitutionally protectible property right in a grade or in a grade grievance procedure, we need not decide that issue in this case. Even assuming that appellant had a protectible property right that gave rise to procedural rights under the due process clause, the facts in the present case show that appellant was afforded adequate procedural due process.

Appellant argues that he was denied adequate procedural due process because he was not provided with a full hearing. The Supreme Court has stated that before a person is deprived of a protected interest, due process requires that the individual be given notice and the opportunity for *some kind* of hearing appropriate to the nature of the case. *See Roth*, 408 U.S. at 570 n. 7, 92 S.Ct. at 2705 n. 7, 33 L.Ed.2d at 556 n. 7 (emphasis added). In *Horowitz*, a case involving the dismissal of a student for academic reasons, the Supreme Court noted that in a case involving the suspension of a student for disciplinary reasons, they had held that the student was only entitled to an "informal give-and-take" between the student and the administration that gave the student the opportunity to explain his conduct. *Horowitz*, 435 U.S. at 86, 98 S.Ct. at 953, 55 L.Ed.2d at 132. Recognizing that the nature of due process negates any inflexible procedures applicable to any situation and the significant difference between the failure of a student to meet academic standards and the violation of rules of conduct by a student, the Supreme Court held that in the case of a dismissal for academic reasons, a hearing is not required by the due process clause. *Id.* at 86 n. 3, 98 S.Ct. at 953 n. 3, 55 L.Ed.2d at 133 n. 3.

■ We believe that the framework of the grading process is entitled to no more strict procedural requirements than the dismissal of a student for academic reasons. Therefore, appellant was not entitled to a

hearing. We also disagree with appellant that the University catalog required that he be given a hearing. All the catalog provides for is a grievance review through defined academic channels, if evidence warrants an appeal.

■ In the instant case, appellant was warned during the semester that failure to finish the nursing process requirement would result in failure of the course. Appellant's work was reviewed by two independent instructors, both of whom recommended a failing grade. Appellant appealed his case to the Dean of the School of Nursing. At that meeting, appellant was allowed to explain his side of the situation. Dean Pickard also considered a second request to reconsider appellant's grade. Appellant then took his case before the Vice President for Academic Affairs, W.A. Baker. Finally, appellant appealed his grade to W.H. Nedderman, President of the University. Based on his review of appellant's documentation and interviews, President Nedderman denied appellant's appeal. President Nedderman also denied a request to reconsider. Appellant enrolled in the course a second time with a different instructor. However, he again received a failing grade. Appellant appealed the second failure to Associate Dean Mary Wyers, Dean Pickard, W.A. Baker, and W.H. Nedderman. Every individual denied appellant's appeal after review of his complaint. Appellant then went beyond the steps outlined in the grievance procedure in the University catalog and contacted various members of The University of Texas System. James P. Duncan, Executive Vice Chancellor reviewed appellant's claims and conducted an investigation. Based on this review, he also denied appellant's appeal. James L. Crowson, General Counsel, informed appellant that the matter was considered closed after review. Finally, Chancellor Hans Mark reviewed appellant's case. Pursuant to his review, he informed appellant that it was not appropriate for him to intercede in University affairs.

We conclude that under the Supreme Court standards discussed above, appellant was afforded adequate procedural due process throughout his conflict with the University and the Nursing School. In addition, appellant was afforded every opportunity to take advantage of the University's grade grievance procedure. In fact, appellant was allowed to go beyond the scope of the grievance procedure.

We next examine appellant's claim that his substantive due process rights were violated. Again, examination of this question is strictly limited by the applicable standard of review. *See Ewing*, 474 U.S. at 227, 106 S.Ct. at 514, 88 L.Ed.2d at 533.

■ Substantive due process protection in the academic arena protects an individual from actions that are arbitrary and capricious. *See Horowitz*, 435 U.S. at 91–92, 98 S.Ct. at 956, 55 L.Ed.2d at 136. The United States Supreme Court has only assumed that courts even have the right to review academic decisions under a substantive due process standard. *Id.; see also Ewing*, 474 U.S. at 222, 106 S.Ct. at 511, 88 L.Ed.2d at 530.

Under the mandate of *Ewing*, a judge may not override the faculty's professional judgment in academic affairs unless "it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment. *Id.* at 225, 106 S.Ct. at 513, 88 L.Ed.2d at 532. Decisions since *Ewing* have followed this mandate. Where a reviewing court has found minimum evidence of "professional judgment," such evidence has been considered sufficient to justify judgment against a student as a matter of law. *See, e.g., Levi v. University of Texas at San Antonio*, 840 F.2d 277, 280 (5th Cir.1988); *Clements v. Nassau County*, 835 F.2d 1000, 1004–05 (2d Cir.1987) (in cases involving academic decisions, university is entitled to summary judgment if evidence exists to show rational basis for decision).

■ Thus, given the narrow and restrained review of academic decisions, a court must review the record for some evidence that professional judgment was exercised. If any evidence exists that there was some rational academic basis for the complained of decision, the substantive

due process inquiry ceases. Given the facts in the present case, we cannot say that the decision to fail appellant was such a substantial departure from accepted academic norms as to conclusively demonstrate that no professional judgment was exercised. Under *Ewing,* the trial court was not authorized to override the university officials' professional judgment, nor are we.

Given our analysis of appellant's due process argument and the applicable case guidelines, we hold that appellant's due process rights were not violated by the appellees.

### Contract Claim

Appellant also contends in the third point of error that the trial court erred in granting summary judgment because the University catalog constituted a contract between the University and appellant. Specifically, appellant claims that said contract gave him certain rights that were not provided by appellees.

Appellant cites the case of *University of Tex. Health Sci. Ctr. v. Babb,* 646 S.W.2d 502 (Tex.App.—Houston [1st Dist.] 1982, no writ) as authority for his position. In *Babb,* the Houston court stated that the university's catalog "constitutes a written contract between the educational institution and the [student], where entrance is had under its terms." *Id.* at 506.

Like the court in *Eiland v. Wolf,* 764 S.W.2d 827, 838 (Tex.App.—Houston [1st Dist.] 1989, writ denied), we also find the *Babb* case to be distinguishable. In *Babb,* there was an express statement contained in the school catalog that allowed a student who started school under the terms of a specific catalog to continue through his program under the same catalog. *Babb,* 646 S.W.2d at 506. The court held that the student was entitled to rely on the terms of the catalog. *Id.*

In the instant case, however, the catalog contains the express notice that "[t]he provisions of this catalog do not constitute a contract, express or implied, between any applicant, student, or faculty member and The University of Texas at Arlington or The University of Texas System."

We do not have to decide the issue of whether, as a rule, the catalog of a state university constitutes a contract between the student and the university. In light of the express disclaimer in the document alleged to be a contract, no enforceable contract existed in the present case. Since a basic requirement of a contract is the intent to be bound, the catalog's express language negates, as a matter of law, the inference of any such intent on the part of the University. *See Wolf,* 764 S.W.2d at 838.

Even if the catalog did in fact constitute a contract with appellant, the record herein demonstrates that appellees complied with the terms and conditions of the catalog applicable in the instant case. The catalog specifically provides for a grade grievance procedure through a specified academic chain of individuals. The catalog states that a grade may be changed if "compelling evidence shows discrimination, differential treatment, or procedural irregularities." The record shows that throughout the course of the grade grievance process, each level of review was performed within the authority and guidelines of the school catalog.

In light of the record before us and our analysis of applicable authority, we find that the trial court did not err in granting summary judgment for appellees. Appellant's third point of error is overruled.

The judgment of the trial court is affirmed.