Affirmed and Opinion filed December 11, 2003









Affirmed and Opinion filed December 11, 2003.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00668-CV

____________

 

KATRINA GUILLORY LAW and BOOKER
T. LAW, III,
Appellants

 

V.

 

WILLIAM MARSH RICE UNIVERSITY, Appellee

 



 

On Appeal from the 280th
District Court

Harris County, Texas

Trial Court Cause No. 2003-23645

 



 

O P I N I O N

By this interlocutory appeal, Katrina Guillory Law and
Booker T. Law, III (the ALaws@) challenge the trial court=s denial of their application
for a temporary injunction, in which they sought to require William Marsh Rice
University (ARice@) to remove an academic
disciplinary suspension.  We affirm.








                                                 I. Background

The Laws are students at
Rice.  During the Spring semester of
2002, the Laws were taking an organic chemistry course that was being taught
jointly by Dr. James Tour and Dr. Seiichi Matsuda.  Because they were in Washington D.C.
attending a minority workshop with Dr. Nicholas Iammarino,
the Laws took the first organic chemistry exam on February 6, 2002, there
rather than on the Rice campus.  On
February 14, 2002, Dr. James Tours, the professor who gave the exam, wrote the
Honor Council with concerns that the Laws had violated the honor code on the
February 6 exam.  In his letter, Dr.
Tours explained that he provided the exams to Dr. Iammarino
to give the Laws while they were in Washington D.C.  According to Dr. Tours, Dr. Iammarino said he told the Laws to take the exams in their
respective hotel rooms and return the exam to him two hours later.[1]  Dr. Iammarino
returned the exams to Dr. Tours on February 11, 2002.  Dr. Tours based his belief that there had
been an honor code violation on the striking similarity of the incorrect
answers on the exams.  Dr. Tours
explained that although there are very few correct solutions to a synthetic
organic problem, there are Amillions of possible incorrect
solutions.@ 

On April 15, 2002, Dr. Seiichi Matsuda reported another
possible honor code violation involving the Laws.  Dr. Matsuda gave an exam on March 27, 2002,
in the same organic chemistry course.  Like
Dr. Tours, Dr. Matsuda noticed the similarity in the incorrect answers,
explaining that Athere are millions of possible
incorrect answers, the chance of all of these being arrived at independently is
exceedingly remote.@  








The Honor Council[2]
decided to hear both complaints against the Laws in one hearing, which was held
on April 18, 2002.[3]  The Laws testified that the similarities in
the answers on their exams was due to having studied together.  Other evidence submitted included the letters
of accusation, the Laws= written statements, the exams,
the depositions (written statements) of the course professors, expert
statements by two Rice professors who reviewed the exam answers, the course
textbook, and the Laws= class notes.  After considering the evidence, the Honor
Council found both Booker and Katrina Law in violation of the honor code and
recommended that they each receive an AF@ in the course and a two
semester suspension.  

The Laws appealed the Honor Council=s decision to Dr. Patricia
Bass, Assistant Dean of Student Judicial Programs at Rice.  Joan Shreffler,
chair of the Honor Council, put together and sent to Dr. Bass an appeal packet
which contained, in addition to the evidence submitted at the hearing, the
chair=s statement, an abstract of the
hearing, and tapes of the hearing.  On
August 1, 2002, after reviewing the evidence from the Honor Council hearing,
Dr. Bass concluded that the Laws were in violation of the honor code and upheld
the grade of AF@ for the course, but overturned
the two semester suspension.  Dr. Bass
informed the Laws that any further appeal should be directed in writing to Dr.
Malcolm Gillis, President of Rice by August 28, 2002.  

The
Laws appealed their case to Dr. Gillis, who informed them on September 18,
2002, that he was sending their case back to the Honor Council for a rehearing.  On October 3, 2002, Joan Shreffler
emailed the Laws allowing them to select between her and another Honor Council
member, who also participated in the first hearing, to preside over the
rehearing of their case.  On October 11,
2002, the Laws responded that they objected to the selection of the possible
chairs for their case and further stated:








We do not necessarily believe that
there is substantive proof that another trial before the same Honor Council
structure, which we went before last spring, can be vindicating.  We have been unfortunate in our past limited
interaction with this group.  We are
hesitant to restart a process that we feel failed us from the outset and whose
failures caused us to initiate the process of appeals in the first [sic].  The consequences involved with participating
in the trial proceedings alone are unappealing in themselves as they distract
heavily from demanding course work and take a heavy emotional toll on accused
students, which is highly unattractive given our situation.  Even if it were feasible to conduct another
trial, it may not be realistically achievable.

Therefore, we feel that in
[sic] the present time we are unable to act further given the circumstances.

On November 8, 2002, Shreffler
informed the Laws by email that she would be presiding over their case.  Shreffler further
informed the Laws that an ombudsmanCa trained student volunteer who
insures that the Honor Council handles the matter according to procedure and is
available to answer their questionsChad been appointed.  Shreffler also told
the Laws that an investigative hearing had been scheduled for November 13,
2002, and explained that if they were unable to attend, the meeting could be
rescheduled.  The purpose of the
investigative meeting was to give the Laws an opportunity to review the letters
of accusation, ask any questions, address the issues raised in the letters, or
make no statement at all.  The Honor
Council would also determine at that time whether there was enough evidence to
warrant proceeding to a hearing.  

On November 11, 2002, the Laws= ombudsman, Kate Gurba, contacted them by email explaining what was to take
place at the investigative meeting.  On
the evening of the November 13 investigative meeting, Booker arrived 30 minutes
late and asked to speak to Shreffler alone in the
hallway.  Booker told Shreffler
that he believed that Dr. Gillis= letter gave them the option to
have or not have a hearing and, therefore, they were choosing not to have a
hearing.  Shreffler
told Booker that she did not believe Dr. Gillis= letter gave them a choice on
whether or not there would be a hearing. 
Nevertheless, the Laws did not attend the investigative meeting.








On November 19, 2002, Shreffler
emailed Katrina, explaining what had transpired at the investigative meeting,
including her conversation with Booker.  Shreffler further informed Katrina that the Honor Council
had decided to proceed to a hearing to be held on November 25, 2002.  

On November 21, 2002, Booker returned home from studying at
school to find Katrina, who was pregnant, lying on the floor.  Katrina had suffered a seizure because of her
preeclampsia, a high blood pressure condition.  Katrina had the baby the next day on November
22, and came home from the hospital on November 24.  

On November 23, 2002, Shreffler
wrote the Laws in response to Booker=s letter to her in which he
clarified his understanding that Dr. Gillis did, in fact, send their case back
to the Honor Council.  Shreffler reminded the Laws that the hearing was set for
November 25, 2002, at 9:00 p.m., and pointed out that they had not contacted
their ombudsman and encouraged them to do so in order to Ato review evidence and to
submit any evidence, including written statements or witness depositions, that
you feel is relevant to your case.@

On the afternoon of November 25, 2002 (the day of the
hearing), Booker informed Shreffler by email that
pursuant to her doctor=s orders, Katrina would not be
able to participate in any Rice activities and attached a copy of a note from
Katrina=s doctor.  The note, dated November 21, 2002, stated, AMrs. Law is currently a patient
at the Women=s & Children=s Clinic and is 38 weeks
pregnant and expected to deliver within the next four weeks.  She has been advised to try and avoid
stressful situations until after delivery of her infant.@  That same day, Shreffler
responded and stated that the Honor Council understood that Katrina would not
be able to attend the hearing that night, but still encouraged her to submit
any evidence she wished, including a written statement to be accepted as testimony,
and suggested that Booker might want Ato speak on her behalf.@  Although the Laws= baby was born on November 22,
three days prior to the November 25 hearing, the Honor Council was not informed
about the birth of the baby.  Booker did
not attend the hearing on November 25. 








The November 25 hearing included much of the same evidence
as that presented in the April 18 hearing, except that due to concerns
expressed by the Laws about Rice professors serving as experts and reviewing
their exams, the Honor Council, at the expense of Rice, requested that two
professors from the University of Houston review the Laws= exams.  After the November 25 hearing, the Honor
Council again found the Laws were in violation of the honor code and
recommended that the Laws each receive an AF@ in the course and that Katrina
receive a two semester suspension.  The
Honor Council, however, recommended that Booker be suspended for an additional
semester (three semester suspension) because he failed to attend the
hearing.  

The Laws again appealed to Dr. Bass, who concluded that the
Laws had violated the honor code. 
However, Dr. Bass reduced Booker=s three semester suspension to
two semesters, explaining AI am sure the Council would not
have given you that sanction if they had known the reason for your failure to
appear,@ i.e., the birth of the
Laws= baby three days earlier.  The Laws appealed their case to Dr. Gillis,
who ultimately upheld Dr. Bass=s decision on April 16, 2003.








On May 5, 2003, the Laws filed an original petition,
asserting claims against Rice for due process violations and breach of
contract, and an application for a temporary injunction requesting that Rice
(1) be required to remove the AF=s@ from the Laws= transcripts and assign the
respective grades they would have received had no disciplinary action been
taken against them, and (2) be prohibited from imposing the two semester
suspension, thereby allowing Booker to attend class and Katrina to graduate on
May 10, 2003, and (3) be required to remove from their records the penalty of
suspension, treating the Laws as students in good standing.  After a hearing on May 19, 2003, the trial
court denied the temporary injunction. 
In this interlocutory appeal, the Laws seek to have reinstated Dr. Bass=s decision which overturned the
two semester suspension, but not the removal of their failing grades in organic
chemistry.[4]

                                          II. Standard of Review

A temporary injunction is an extraordinary remedy and does
not issue as a matter of right.  Butnaru v. Ford Motor Co., 84 S.W.3d 198, 204
(Tex. 2002).  The purpose of a temporary
injunction is to preserve the status quo pending a final trial on the
merits.  Warren v. Aldridge, 992
S.W.2d 689, 690 (Tex. App.CHouston [14th Dist.] 1999, no
pet.).  Status quo is defined as the Athe last, actual, peaceable,
non-contested status that preceded the pending controversy.@  State v. Southwestern Bell Tel. Co.,
526 S.W.2d 526, 528 (Tex. 1975). 

An applicant must plead and prove (1) a cause of action
against the defendant; (2) a probable right to the relief sought; and (3) a
probable, imminent, and irreparable injury in the interim.  Butnaru
Co., 84 S.W.3d at 204.  The trial
court should grant temporary injunctive relief only if the applicant
demonstrates a probable right to permanent relief upon a trial on the merits
and a probable injury during the pendency of the
trial unless the injunction issues.  Allan
J. Richardson & Assocs., Inc. v. Andrews, 718 S.W.2d 833, 835 (Tex.
App.CHouston [14th Dist.] 1986, no
writ) (citing Sun Oil Co. v. Whitaker, 424 S.W.2d 216, 218 (Tex.
1968)).  Probable injury includes
elements of imminent harm, irreparable injury, and no adequate remedy at law
for damages, while probable right includes the element of wrongful conduct.  Surko
Enters., Inc. v. Borg-Warner Acceptance Corp., 782 S.W.2d 223, 225 (Tex.
App.CHouston [1st Dist.] 1989, no
writ).  An existing remedy is adequate if
it Ais as complete and as practical
and efficient to the ends of justice and its prompt administration as is
equitable relief.@  Ballenger v. Ballenger, 694 S.W.2d 72,
76 (Tex. App.CCorpus Christi 1985, no
writ).  The applicant is not required to
establish that he will prevail in the litigation.  Walling v. Metcalfe, 863 S.W.2d 56, 58
(Tex. 1993); Transport Co. of Tex. v. Robertson Transp.,
Inc., 152 Tex. 551, 261 S.W.2d 549, 552 (1953). 








The appeal of an order either granting or denying temporary
injunctive relief is interlocutory.  Tex. Civ. Prac. & Rem. Code Ann.
' 51.014(a)(4) (Vernon Supp.
2003).  Therefore, the merits of the
underlying case are not presented for appellate review.  Davis v. Huey, 571 S.W.2d 859, 861
(Tex. 1978).  The denial of a temporary
injunction lies within the sound discretion of the trial court.  Walling, 863 S.W.2d at 58.  Thus, our review is limited to whether the
trial court abused its discretion in either granting or denying the temporary
injunction.  Brooks v. Expo Chem. Co.,
576 S.W.2d 369, 370 (Tex. 1979).  The
trial court abuses its discretion if it acts arbitrarily and unreasonably,
without reference to guiding rules or principles, or if it misapplies the law
to the established facts of the case.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241B42 (Tex. 1985).  The trial court does not abuse its discretion
when it bases its decision on conflicting evidence.  Davis, 571 S.W.2d at 862.  We must draw all legitimate inferences from
the evidence in the light most favorable to the trial court=s decision.  Bertotti
v. C.E. Shepherd Co., 752 S.W.2d 648, 655 (Tex. App.CHouston [14th Dist.] 1988, no
writ).  Therefore, we may not substitute
our judgment for that of the trial court. 
Davis, 571 S.W.2d at 862.

                                III.  Probable right of Recovery








The Laws assert that Rice breached its promise to afford
protections promoting fundamental fairness in its judicial proceedings and to
conduct those proceedings impartially. 
As Rice acknowledges, the relationship between a private school and its
students Ahas by definition primarily a
contractual basis,@ Eiland
v. Wolf, 764 S.W.2d 827, 838 (Tex. App.CHouston [1st Dist.] 1989, writ
denied), but the issue here is what terms comprise that contractual
relationship.  See Goodman v.
President & Trs. of Bowdoin
College, 135 F. Supp. 2d 40, 56 (D. Me. 2001) (having determined that
student and school had contractual relationship, court explained A[t]he more complicated question
for the Court concerns whether this contractual relationship included the
Student Handbook terms, the alleged violation of which forms the basis of
Plaintiff=s claims against Bowdoin@); Villarreal v. Art Inst.
of Houston, Inc., 20 S.W.3d 792, 797B98 (Tex. App.CCorpus Christi 2000, no pet.)
(having determined that, at minimum, implied contract existed that school would
provide student with educational opportunity and confer degree in consideration
for student=s agreement to successfully
complete degree requirement, abide by school=s guidelines, and pay tuition,
court stated student had to prove existence of contract containing terms upon
which she based her suit).  








The First Court of Appeals held that a school=s catalog constitutes a written
contract between the educational institution and the student, where entrance is
had under its terms.  See University
of Tex. Health Sci. Ctr. at Houston v. Babb, 646
S.W.2d 502, 506 (Tex. App.CHouston [1st Dist.] 1982, no
writ).  However, other cases have
distinguished the holding in Babb, observing that the school catalog in
that case contained an express statement allowing a student who began under the
terms of a certain catalog to continue the program under that same
catalog.  See Southwell
v. University of Incarnate Word, 974 S.W.2d 351, 355B56 (Tex. App.CSan Antonio 1998, pet. denied);
Tobias v. University of Tex. at Arlington, 824 S.W.2d 201, 211 (Tex.
App.CFort Worth 1991, writ denied); Eiland, 764 S.W.2d at 838.  However, where there is an express disclaimer
negating any intent by the school to be bound by the terms of its catalog or
handbook, no enforceable contract exists. 
See Southwell, 974 S.W.2d at 355B56 (holding that school
bulletin did not create contract where it stated A[t]his bulletin is for
informational purposes only. . . . The college reserves the right to change or
alter any statement herein without prior notice,@ signifying lack of intent by
Incarnate Word to be bound by terms of bulletin ); Tobias, 824 S.W.2d at
211 (holding that where catalog contained express language that A[t]he provisions of this
catalog do not constitute a contract, express or implied, between any
applicant, student, or faculty member and The University of Texas at Arlington
or The University of Texas System,@ negating inference of intent
by school to be bound its terms, no contract existed); Eiland,
764 S.W.2d at 838 (holding that where catalog contained express notice that A[t]he provisions of this
catalog are subject to change without notice and do not constitute an
irrevocable contract between any student . . . and the University of Texas
Medical School at Galveston,@ no enforceable contract
existed because express language negated any intent by school to be
bound).  

The Laws contend they have tendered performance of their
contract with Rice because they have paid tuition and attended the required
courses as set forth in the Rice catalog. 
A[W]here a private college or
university impliedly agrees to provide educational opportunity and confer the
appropriate degree in consideration for a student=s agreement to successfully
complete degree requirements, abide by university guidelines, and pay tuition,
a contract exists.@  Southwell,
974 S.W.2d at 356.  However, the Laws
assert Rice breached their contract by conducting the second disciplinary
hearing without their attendance.  A
review of the Laws= petition reflects that the
crux of their breach of contract claim is that Rice breached its contractual
duty by failing to provide them a fair process in its disciplinary proceedings,
not that they are not getting the education for which they paid.  

Rice
argues the individual procedures set forth in the Blue Book[5]
do not confer specific contractual rights on any student.  The Blue Book specifically states: 

The
procedures outlined in this booklet are intended to aid the Honor Council in
its efforts to ascertain the facts of a matter and to reach a just
decision.  They do not confer any
contractual rights on the accused. 
Circumstances can differ greatly between cases, and the Chair of the
Council or the Assistant Dean of Student Judicial Programs may need to
modify the procedures in a particular case in order to reach a timely and
just decision.[6]

As in Southwell, Tobias,
and Eiland, the above language in the Rice
Blue Book expressly negates any intent by Rice to be contractually bound by its
disciplinary procedures.  Thus, the
specific procedures set forth in the Blue Book are not an enforceable contract
between Rice and the Laws.  








In the absence of a valid contract, either express or
implied, between Rice and the Laws with regard to the procedures provided in
the Honor System, the Laws have not shown a probable right to recovery in a
trial on the merits on their claim for breach of contract.[7]  

                                            IV. 
Probable Injury

The Laws also contend they have no adequate remedy at law
because their damages cannot be measured in monetary terms.  To establish there is no adequate remedy at
law, the Laws must show that an award of damages would be inadequate for the
harm suffered.  Universal Health Servs., Inc. v. Thompson, 24 S.W.3d 570, 578 (Tex. App.CAustin 2000, no pet.).  Katrina, who was offered a job with Teach for
America, asserts she will not be able to participate in that program unless she
graduates.  Booker will not be able to
return to Rice for two semesters and, therefore, will not have the opportunity
to pursue any job with his degree qualifications for at least a year.  The Laws contend they will not be able to financially
manage their family.  Such harm, however,
can be compensated by monetary damages.  See
Ben-Yonatan v. Concordia College Corp., 863 F.
Supp. 983, 986 (D. Minn. 1994) (denying motion for preliminary injunction and
holding student=s allegation of loss of one
year=s compensation as medical
doctor due to one year=s suspension was compensable by
monetary damages, thereby precluding threat of irreparable harm).  

                                           V.  Irreparable Harm








The
Laws also claim they will suffer irreparable harm if the two semester
suspension is not removed.  Katrina
argues she will be stigmatized if a notation is placed on her record that she
was suspended because of an academic violation. 
Booker asserts that if the academic suspension remains on his record, he
will be prevented from pursuing graduate studies.  Contrary to the Laws= allegation that their academic
suspension will be noted on their academic record, the Laws= ombudsman informed them that
the suspension and reason for the failing grade will not appear on their
transcript or other permanent record:

. . . The reason for your F in this
course will not be noted on your transcript; it will look as though you
received this grade on your own.

A suspension clause has also
been attached to your record.  This is an
internal note for our records that you have been found in violation of the
Honor Code.  If you should come before us
at some point in the future and are again found in violation, this clause
allows us to go above our Consensus Penalty Structure when deciding on an
appropriate penalty.  This clause will
not appear on your transcript or any other permanent records.

According to their ombudsman, the suspension clause is noted
only on Rice internal records and will become relevant only if they are found
in violation of the honor code on another occasion.  The Laws did not offer any evidence to the
contrary and, thus, have failed to show irreparable harm.  

                                  VI.  Preserving the Status Quo

Finally, the relief the Laws seek is beyond just preserving
the status quo pending a trial on the merits. 
The status quo to be preserved is Athe last, actual, peaceable,
non-contested status that preceded the pending controversy.@  Southwestern Bell Tel. Co., 526 S.W.2d
at 528.  The Laws contend the last,
actual, peaceable, non-contested status was Dr. Bass=s decision to overturn the two
semester suspension.  We disagree.  The Laws appealed that decision to Dr.
Gillis.  Instead, the last, actual,
peaceable, non-contested status is Dr. Gillis= decision to uphold Dr. Bass=s decision after the second
disciplinary hearing, i.e., the failing grade in organic chemistry and
the two semester suspension.  See
Edgewood Indep. Sch. Dist. Paiz, 856 S.W.2d 269, 271 (Tex. App.CSan Antonio 1993, no writ)
(holding status quo was school district=s decision to prohibit student
who had not passed TAAS test from participating in graduation ceremonies).  








Moreover, in vacating the temporary injunction, the Paiz court further explained that the trial court=s order reversed the status
quo, thereby providing the plaintiff Athe complete relief he seeks
and deprives the school district of any right to contest the matter before the
passage of time renders it moot and unremediable.@  Id. 
Similarly, requiring Rice to remove the two semester suspension would
allow Katrina to graduate rendering moot Rice=s right to take disciplinary
action against her.  

The trial court did not abuse its discretion in denying the
Laws= application for a temporary
injunction.  Accordingly, the judgment of
the trial court is affirmed.  

 

 

 

 

/s/      J. Harvey Hudson

Justice

 

 

 

 

Judgment
rendered and Opinion filed December 11, 2003.

Panel
consists of Justices Yates, Hudson, and Fowler.











[1]  The Laws were
not married at that time.  





[2]  The members of
the Honor Council are Rice students.  





[3]  This decision
was an act of grace intended to benefit the Laws.  If the Honor Council heard the complaints
separately, the Laws faced the possibility of two honor code violations rather
than one.  A single honor code violation
can result in a suspension clause, but this clause is never included on the
student=s transcript or permanent records, and the AF@ in the course appears to be the actual grade made by
the student.  However, if a student is
convicted of two honor code violations, a suspension clause is included on the
student=s transcript.  





[4]  Despite the
failing grade in organic chemistry, Katrina was still eligible to
graduate.  





[5]  The booklet
titled, AThe Honor System Rice University,@ is commonly referred to as the ABlue Book.@  





[6]  Emphasis
added.  





[7]  Although the
Laws asserted a due process claim in their original petition, they have not
addressed that claim in this appeal.