RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0017p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

AMIR A. AL-DABAGH,

*Plaintiff-Appellee,*

*v.*

No. 14-3551

CASE WESTERN RESERVE UNIVERSITY,

*Defendant-Appellant.*

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:14-cv-01046—James S. Gwin, District Judge.

Argued: January 22, 2015

Decided and Filed: January 28, 2015

Before: BATCHELDER, SUTTON, and COOK, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** John B. Nalbandian, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellant. Peter A. Holdsworth, WEGMAN, HESSLER & VANDERBURG, Cleveland, Ohio, for Appellee. **ON BRIEF:** John B. Nalbandian, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, David H. Wallace, Jennifer B. Orr, TAFT STETTINIUS & HOLLISTER LLP, Cleveland, Ohio, for Appellant. Peter A. Holdsworth, Christopher A. Holecek, Patrick J. Quallich, WEGMAN, HESSLER & VANDERBURG, Cleveland, Ohio, for Appellee.

───────────────

**OPINION**

───────────────

SUTTON, Circuit Judge. Authority to decide whether a medical student deserves a degree usually rests with the student's school. In this unusual case, that did not happen. A federal district court found that Amir Al-Dabagh had proven himself worthy of a diploma and

1

ordered Case Western Reserve University School of Medicine to give him one—disregarding the university's determination that he lacked the professionalism required to discharge his duties responsibly. Because that lack-of-professionalism finding amounts to an academic judgment to which courts owe considerable deference, we must reverse.

Anyone who has ever been to a doctor's office knows the value of a good bedside manner. That is why Case Western does more than just teach its students facts about the human body. Its curriculum identifies nine "core competencies." First on the list is professionalism. Medical knowledge does not make an appearance until the fifth slot.

The curriculum tells a student to exercise professionalism in four ways:

- Consistently demonstrate[] ethical, honest, responsible and reliable behavior.
- Identif[y] challenges to professionalism and develop[] a strategy to maintain professional behaviors when adherence to professional standards is threatened in the clinical and/or research settings.
- Engage[] in respectful dialogue with peers, faculty, and patients, to enhance learning and resolve differences.
- Recognize[] personal limitations and biases and find[] ways to overcome them.

R. 15-1 at 93, PageID #534.

The university's student handbook emphasizes professionalism in several other places. Here: Case Western values "student professionalism . . . as highly as mastery of the basic sciences and clinical skills." *Id.* at 61, PageID #502. And here: A Case Western degree conveys not only "a level of competency as measured by performance on tests" but also "a commitment to professional responsibility." *Id.* at 62, PageID #503. And here: "Medical school education entails the mastery of didactic, theoretical, and technical material, as well as the demonstration of appropriate professional and interpersonal behavior." R. 2-8 at 2, PageID #161.

The task of figuring out whether a student has mastered these professionalism requirements falls to the university's Committee on Students. Assembled from the university's faculty and administrators, the Committee "conducts detailed reviews" of a student's exam scores, clinical performance, and "professional attitudes and behavior." *Id.* at 1–2, PageID

#160–61.  A student cannot receive a degree without the Committee's approval, good grades notwithstanding.

Amir Al-Dabagh enrolled at Case Western's medical school in 2009.  He did well academically, as exhibited by recommendation letters praising his "academic excellence" in 2011 and 2013, R. 10-5 at 1, PageID #345; *see* R. 10-6 at 1, PageID #347.  He even published several articles and won a special award for "Honors with Distinction in Research."  R. 2-7 at 1, PageID #159.

Professionalism was another matter.  His troubles began during his first semester.  All first-year medical students must participate in discussion sessions and arrive on time to each of them.  Al-Dabagh came late to almost thirty percent of the meetings, holding up the class as a result.  According to his instructor, he asked not to be marked late each time.  According to his own testimony, he asked only once, and only then because the admitted student he was hosting was also running late.  But he does not deny the tardiness or its frequency.  And in his instructor's judgment, quite reasonably, "[a]sking [a faculty member] to lie about attendance" is "a more serious breach of professionalism[] than tardiness itself."  R. 12-3 at 3, PageID #375.

The problems did not stop there.  In 2012, two female students accused Al-Dabagh of behaving inappropriately at a formal dance called the Hippo Ball—short (we presume) for Hippocrates.  One said he propositioned her for sex, "grab[bed her] hand and trie[d] to pull [her] towards the dance floor," and told her that, "[I]f you don't dance with me, I'm gonna embarrass you until you do."  R. 12-1 at 2, PageID #368.  The other said she was walking across the room when she "felt someone grab [her] butt."  *Id.* at 4, PageID #370.  When she turned around, she saw Al-Dabagh—at which point he and her boyfriend nearly came to blows.  Later that night, according to a police incident report, Al-Dabagh jumped out of a moving taxi after attempting to stiff its driver out of a twenty-dollar fare.  Al-Dabagh recalls the night differently.  He never harassed anyone, never tried to welch on the driver, and fell out of the cab when "someone assaulted" him.  R. 2-2 at 2, PageID #128.  Whatever happened, the night's events sparked his first run-in with the Committee, which forced him to undergo "an intervention on professionalism" and threatened him with "dismissal" if "further issues" arose.  R. 15-10 at 2, PageID #598.

Further issues arose.  In 2013, Al-Dabagh received a stinging evaluation about his performance in an internal medicine internship.  Nurses and hospital staffers "consistently complained about his demeanor"; a patient's family once "kicked him out of the room"; and he sometimes gave patient-status presentations without first preparing.  R. 12-5 at 2, PageID #379.  Al-Dabagh by contrast asserts that the negative comments stemmed from his "critical . . . attitude" toward one of his supervisors—an account confirmed by another evaluator.  R. 2-2 at 3, PageID #129; R. 2-11 at 1–2, PageID #165–66.  But he does not dispute that the Committee "serious[ly] consider[ed]" dismissing him in response.  R. 15-3 at 5, PageID #545.  It opted for less severe but still drastic measures, requiring him to repeat the internship and enrolling him in "gender specific training."  R. 2-12 at 1, PageID #167.  It also added an addendum to his letter of recommendation for residency programs, the existence of which a faculty supporter described as "very permanent[ly] . . . damaging" and "too heavy a punishment."  R. 2-11 at 1, PageID #165.  The Committee had not written such an addendum in at least twenty-five years.  When Al-Dabagh appealed, the Committee reaffirmed its decision, citing "a pattern of unprofessionalism with regard to communication and personal conduct."  R. 12-8 at 2, PageID #385.

Matters came to a head in April 2014, when the university received word that North Carolina had convicted Al-Dabagh for driving while intoxicated.  Al-Dabagh insists that he was not in fact drunk.  He swerved to miss a deer, he says, and hit a utility pole instead.  The university by this point had already invited Al-Dabagh to graduate.  No matter:  The Committee convened an emergency session, unanimously refused to certify him for graduation, and dismissed him from the university.  After he appealed, the Committee agreed to lighten its punishment, offering to let him withdraw from the university in writing—freeing him to apply to other programs without having to explain a damaging official dismissal.

Al-Dabagh did not accept the Committee's offer.  Instead, he sued the university in federal district court, alleging that it breached its state-law duties of good faith and fair dealing when it declined to award him a degree.  The court agreed, ordering the university "to issue a diploma to [Al-Dabagh] as having satisfied the requirements to become a doctor of medicine and to list [him] as having graduated in whatever ways are customary for the school."  R. 19 at 1.

The university appeals. Reviewing the district court's factfinding for clear error and its legal conclusions anew, we reverse.

To start, we must smooth out a procedural wrinkle. After losing in the district court, Case Western did not move for a stay. Instead, it complied with the injunction and gave Al-Dabagh a degree. Thanks to its decision, Al-Dabagh is now a practicing resident. Doesn't that moot the case? No, because the university will revoke that degree if it wins. *See* Motion to Expedite Appeal, *Al-Dabagh v. Case W. Reserve Univ.*, No. 14-3551. And an appeal remains alive if the effects or benefits of compliance can be undone. Charles Alan Wright et al., 13B *Federal Practice and Procedure* § 3533.2.2 (3d ed. 2014); c*f. Carachuri-Rosendo v. Holder*, 560 U.S. 563, 573 n.8 (2010). We therefore have jurisdiction to move on.

Ohio treats the relationship between a university and its students as "contractual in nature." *Behrend v. State*, 379 N.E.2d 617, 620 (Ohio Ct. App. 1977). Case Western's student handbook supplies the contract's terms, as the parties agree, and makes clear that the only thing standing between Al-Dabagh and a diploma is the Committee on Students's finding that he lacks professionalism. Unhappily for Al-Dabagh, that is an academic judgment. And we can no more substitute our personal views for the Committee's when it comes to an academic judgment than the Committee can substitute its views for ours when it comes to a judicial decision. Ohio law allows a court to overturn such judgments only if they are "arbitrary and capricious," regardless of "whether the court would have decided . . . matter[s] differently." *Bleicher v. Univ. of Cincinnati Coll. of Med.*, 604 N.E.2d 783, 788 (Ohio Ct. App. 1992). Federal Due Process law comes to the same end. A court must "show great respect for the faculty's professional judgment" and may not "override" that judgment "unless it is such a substantial departure from accepted academic norms as to demonstrate that the . . . committee responsible did not actually exercise professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985).

Al-Dabagh's dismissal on professionalism grounds amounts to a deference-receiving academic judgment for several reasons. The student handbook—the governing contract—says professionalism is part of Case Western's academic curriculum at least four times. Judges are "ill equipped" to second-guess the University's curricular choices. *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 576 (6th Cir. 1988). The Ohio Supreme Court indeed has deferred to a

similar form of academic judgment by this same institution in the past.  In a case with greater equities than this one, the Court approved the medical school's refusal to admit a gifted blind applicant because its goal was not to train "specialized" doctors—she wished to be a psychiatrist—but generalist ones capable of "function[ing] in a broad variety of clinical situations."  *Ohio Civil Rights Comm'n v. Case W. Reserve Univ.*, 666 N.E.2d 1376, 1387 (Ohio 1996).

Nor do we have any reason to doubt the propriety of *this* curricular choice. Professionalism has been a part of the doctor's role since at least ancient Greece.  The original Hippocratic Oath required adherents to "refrain . . . from acts of an amorous nature" in "[w]hatsoever house [they] may enter," "whatever may be the rank of those whom it may be [their] duty to cure."  3 *The London Medical Repository* 258 (James Copland ed., 1825).  It is entirely reasonable to assess the presence of professionalism early.  For once a medical student graduates, we must wait for a violation before we may punish the absence of it.  *See Pons v. Ohio State Med. Bd.*, 614 N.E.2d 748 (Ohio 1993) (affirming a medical board's decision to suspend a doctor after he had sex with an emotionally vulnerable patient).  Cases defining "academic decisions" in the Due Process context confirm the point.  The United States Supreme Court has even deemed "academic" a school's decision to dismiss a student who "lacked a critical concern for personal hygiene."  *Horowitz v. Bd. of Curators of Univ. of Mo.*, 435 U.S. 78, 81 (1978).

We repeatedly have emphasized that "academic evaluations" may permissibly extend beyond "raw grades [and] other objective criteria."  *Ku v. Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003); *see Yoder v. Univ. of Louisville*, 526 F. App'x 537, 549–50 (6th Cir. 2013).  Other circuits have come to the same conclusion.  Dismissing a medical student for lack of professionalism is "academic," says one.  *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 463 (4th Cir. 2012).  Refusing to approve a Ph.D. thesis because its acknowledgement section was unprofessional is "academic," says another.  *Brown v. Li*, 308 F.3d 939, 943, 952 (9th Cir. 2002). Dismissing a student for "non-cognitive" problems like "sleeping in" is "academic," says still another.  *Richmond v. Fowlkes*, 228 F.3d 854, 856, 858 (8th Cir. 2000).  And so on.  *See Harris v. Blake*, 798 F.2d 419, 423 (10th Cir. 1986) (dismissing a student for failing to attend practical

class sessions is "academic"); *Perez v. Tex. A & M Univ. at Corpus Christi*, No. 14-40081, 2014 WL 5510955, *4 (5th Cir. Nov. 3, 2014) (dismissing a student for tardiness is "academic").

Whether we take our cue from Case Western's curriculum, the student handbook contract between the student and university, the Supreme Court, the Ohio cases, our own cases, or cases from other circuits, the conclusion is the same: The Committee's professionalism determination is an academic judgment. That conclusion all but resolves this case. We may overturn the Committee only if it "substantial[ly] depart[ed] from accepted academic norms" when it refused to approve Al-Dabagh for graduation. *Ewing*, 474 U.S. at 225. And given Al-Dabagh's track record—one member of the Committee does not recall encountering another student with Al-Dabagh's "repeated professionalism issues" in his quarter century of experience, R. 15-5 at 3, PageID #560—we cannot see how it did.

To the contrary, Al-Dabagh insists: The Committee's decision was a "punitive disciplinary measure" that had nothing to do with academics. Appellee's Br. at 27. In support, he points to the handbook's statement that the Committee "acts on behalf of the Faculty of Medicine in non-academic disciplinary matters involving medical students." R. 15-1 at 60, PageID #501. Doesn't this show that its action was non-academic in nature? No, for two reasons. First, his argument overlooks the reality that the university's disciplinary procedures are parallel to, not exclusive of, the Committee's role in approving students for graduation. That same handbook section makes clear that "[u]nprofessional activities may also be subject to a formal university disciplinary action." *Id.* at 59, PageID #500. And the Committee's refusal to approve Al-Dabagh for graduation took place outside the disciplinary process. Second, his argument fails to wrestle with the prominent place of professionalism in the university's academic curriculum—which itself is an academic decision courts may not lightly disturb.

Even if professionalism *is* an academic criterion, Al-Dabagh persists that the university defined it too broadly. As he sees it, the only professional lapses that matter are the ones linked to academic performance. That is not how we see it or for that matter how the medical school sees it. That many professionalism-related cases involve classroom incidents does not establish that *only* classroom incidents are relevant to the professionalism inquiry, and Al-Dabagh has identified no case holding that the concept must be defined so narrowly. An analogy illustrates

the point.  Our own standards indicate that professionalism does not end at the courtroom door.  *E.g.*, Supreme Court Rules for the Government of the Bar of Ohio, Rule I, § 11(D)(3)(b), (k) (instructing Ohio's bar admissions committee to consider an applicant's drug and alcohol problems and his "[n]eglect of financial responsibilities" when assessing his character and fitness).  Why should hospitals operate any differently?  As for the danger that an expansive view of professionalism might forgive, or provide a cloak for, arbitrary or discriminatory behavior, we see no such problem here.  Nothing in the record suggests that the university had impermissible motives or acted in bad faith in this instance.  And nothing in our deferential standard prevents us from invalidating genuinely objectionable actions when they occur.

Al-Dabagh next claims that the university's residency-recommendation letters demonstrate that his missteps were not a big deal.  Had he really been as unprofessional as the university now makes him out to be, he asks, why did it praise his professionalism when he applied to residency programs?  At one level, we share Al-Dabagh's puzzlement.  Why did the university omit any mention of his professionalism-related struggles from its recommendation?  Its explanation—that it tries "to support its students as much as possible," R. 18 at 18–19, PageID #656–57—is unconvincing.  Even so, the university sent the recommendation *before* Al-Dabagh failed his internship.  It was that failure that first led the Committee to contemplate Al-Dabagh's dismissal.  And it was that failure that prompted the university to provide an addendum to its recommendation that referenced Al-Dabagh's problems.

Al-Dabagh, last of all, claims that the Committee faulted him for things that didn't happen (for instance, the sexual harassment incidents at the Hippo Ball) and disregarded his explanations for the things that did (for instance, his poor internship performance and his driving-while-intoxicated conviction).  He invites us to decide for ourselves whether he behaved in a sufficiently professional way to merit a degree.  That, as we have made clear, goes beyond our job description.  It was neither arbitrary nor capricious for the Committee to credit other accounts above Al-Dabagh's.  And if a dismissal from medical school for poor hygiene and untimeliness falls within the realm of reason, *Horowitz*, 435 U.S. at 91 n.6, it should go without saying that Al-Dabagh's dismissal falls within the realm of reason too.

For these reasons, we reverse.