

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| | § | |
| TEXAS TECH UNIVERSITY | | |
| HEALTH SCIENCES CENTER, | § | No. 08-15-00257-CV |
| PAUL L. FOSTER SCHOOL OF | | |
| MEDICINE, RICHARD LANGE, M.D., | § | Appeal from |
| M.B.A., AND PABLO MOUJAN, M.D., | | |
| | § | 448th District Court |
| Appellants, | | |
| | § | of El Paso County, Texas |
| v. | | |
| | § | (TC # 2015-DCV-1838) |
| VICTOR TABI ENOH, M.D., | | |
| | § | |
| Appellee. | | |
| | § | |

## **O P I N I O N**

This is an interlocutory appeal from the denial of a plea to the jurisdiction. We are principally asked to decide whether Dr. Victor Enoh was denied procedural due process when Texas Tech University Health Sciences Center, Paul L. Foster School of Medicine (Texas Tech) failed to certify that Dr. Enoh successfully completed the final year of a three year anesthesiology residency program. For the reasons noted, we reverse and render judgment dismissing the suit for lack of subject matter jurisdiction.

## DR. ENOH'S PLED ALLEGATIONS

Dr. Enoh sued Texas Tech, and Drs. Lange and Moujan in Texas state court. An earlier federal suit involving some of the same parties, and many of the same issues, had previously been dismissed. The state court petition alleges that Dr. Enoh was accepted into the El Paso residency program at Texas Tech on July 1, 2011. He pursued a specialty in anesthesiology and was scheduled to finish the program on June 30, 2014. He successfully completed the first two years of the program, and alleges that he received excellent evaluations.

The program involved rotations through several sub-specialty areas where the residents were supervised by different faculty anesthesiologists. Dr. Pablo Moujan supervised Dr. Enoh on one rotation in July 2013. Dr. Enoh reported to the resident program director, Dr. Anthony Han, that Dr. Moujan was completely absent for an entire week during that rotation. According to the petition, Dr. Moujan became upset at being reported, and allegedly stated that he would make Dr. Enoh's "life hell." Later, Dr. Moujan became the associate program director. The petition alleges that Dr. Moujan demanded that Dr. Enoh be placed on probation and "did everything possible to see that [Dr. Enoh] failed."

The petition then complains of several specific actions taken by Texas Tech. First, in January 2014, Dr. Enoh claims he was informed that he had failed the previous six month portion of the program. He alleges that he requested the right to appeal this decision, but his request for an appeal was denied. The petition alleges this denial was contrary to policy, and in lieu of an appeal, Dr. Enoh was transferred to a hospital in Houston to finish his residency.

Then in May 2014, Texas Tech accused him of misusing a state issued credit card. Dr. Enoh alleges that he was suspended from May 5, 2014 to June 3, 2014 without any opportunity for due process. As a part of probation, he was required to perform several extra requirements,

2

which he completed. Nevertheless, on June 19, 2014, he was informed that Texas Tech would not give him credit for the entire last year of his training. Dr. Enoh appealed that decision and claims that at a June 30, 2014 hearing, the Texas Tech "staff disparaged and condemned [Dr. Enoh] and yelled at him in an extremely unprofessional manner." He further claims that he was not allowed "to defend himself, present any evidence or testimony, or even speak." The appeal was denied and Dr. Enoh claims this prevents him from enrolling in a vascular anesthesiology fellowship at another institution.

From these factual assertions, Dr. Enoh pleaded five seeks (1) declaratory relief against Texas Tech[1], and (2) temporary and permanent injunctive relief. He further alleges (1) ultra vires acts; (2) denial of "due course of law"; (3) discrimination based on race, color, and national origin; and (4) breach of contract. The petition attaches the affidavit of Dr. Hana Teissler MD, who was formerly an assistant professor at Texas Tech, and the Associate Residency Program Director. She swore "that to her knowledge" Dr. Enoh completed the requisites for program. She also recounts that Dr. Moujan "had an intense personal dislike towards" Dr. Enoh and "did everything possible to fail" him.[2]

## THE PLEA TO THE JURISDICTION AND ITS EVIDENCE

Texas Tech and the individual doctors filed a plea to the jurisdiction which attached several exhibits and affidavits. We briefly summarize the evidence germane to the issues before us.

---

[1] In the petition, the declaratory relief count asks for a declaration that Dr. Enoh had a right to present evidence at the hearing and was wrongly denied that right, breaching his contract with Texas Tech. The request for relief portion of the petition, however, seeks a broader declaration, including that the adverse action in June 2014 be declared void, and that because Dr. Enoh met all the clinical and educational requirements for the program, "[he] should be issued a Certificate of Anesthesiology" from Texas Tech.

[2] The petition itself was sworn to by Dr. Enoh, but for the purposes of the plea to the jurisdiction, which we later explain operates like a motion for summary judgment, we do not consider the allegations in the petition, even if verified, as substantive evidence. *See Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer,* 904 S.W.2d 656, 660 (Tex. 1995); *In re East*, 476 S.W.3d 61, 68 (Tex.App.--Corpus Christi 2014)(orig. proceeding).

3

## The Graduate Medical Education Program Contract

Dr. Enoh and Texas Tech entered into a "Graduate Medical Education Program Agreement or Appointment" covering the period from July 1, 2013 to June 30, 2014. Dr. Enoh's duties and responsibilities included: (1) providing patient care; (2) demonstrating "interpersonal and communication skills" sufficient to interact with patients, patients' families and other health care professionals; and (3) demonstrating "behaviors that reflect a commitment to continuous professional development, ethical practice, and understanding and sensitivity to diversity and a responsible attitude toward his/her patients, profession and society."

Texas Tech was required under the contract to formally evaluate his knowledge, skills and professional progress in a written format at least semi-annually. The evaluation criteria were to be based on the national standards of the respective medical specialty accrediting organization. The applicable standards here were from the American Board of Anesthesia, the first two of which focus on professionalism: each candidate for board certification must demonstrate "high standards of ethical and moral behavior" and "honesty, integrity, reliability, and responsibility."

The written evaluations were to be made available to the resident who "will be granted the right to present his/her views and any extenuating circumstances during this academic/performance review process." When resident performance or progress was not deemed satisfactory, Texas Tech could take any number of actions including observation, probation, suspension, or dismissal. "Each of these actions, as well as the policy and procedure that should be followed to grieve any adverse action," were governed by the Adverse Action Appeals Policy. The program director was also to decide whether the resident would be reappointed from year to year and advance. The decision not to advance or to not renew a

4

resident's appointment could be appealed following the protocol specified in the Adverse Action Appeals Policy.

That appeals policy requires a resident to be given notice of any adverse action within two working days of the action, with the resident then allowed to make a written request for appeal within the next five days. An appeal was to be heard by an Appeals Review Committee which is comprised of faculty members appointed from departments other than that of the resident. The resident and the program director "shall have the right to address the Appeals Review Committee and may introduce evidence considered to be relevant and material to the case. All evidence offered must be reasonably related to the facts and statements concerning the reasons for the adverse action."

The Appeals Review Committee under the policy would then issue a report which might uphold, modify, or overturn the decision made by the program director. If the recommendation for non-promotion or probation is upheld by the committee, then the program director has the ultimate decision-making authority. If the recommendation is to overturn the non-promotion or probation, the committee must provide a specific action plan to be followed by the program director.

### January 2004 Evaluation

A Clinical Competency Committee met on January 21, 2014 and concluded that Dr. Enoh performed unsatisfactorily on his professionalism criteria during the first six months of his third year of the program. The basis for the conclusion included the failure to follow up with patients and leaving the hospital without informing others. Dr. Enoh appealed this conclusion and the committee re-convened and affirmed its original conclusion. A mentor was selected for a remediation plan.

5

**The Credit Card Issue**

On May 19, 2014, Dr. Ham, the program director, sent Dr. Enoh a letter notifying him of Texas Tech's intent to dismiss him from the program. The decision was based on Dr. Enoh's "unprofessional behavior and conduct" "poor judgment," and "intentional disregard for policies and procedures." The letter details two allegations. The first involved misuse of a state issued travel credit card. Following a call from a vendor on May 7, 2014, Texas Tech reviewed the credit card transaction history and noticed several charges for personal items. Dr. Enoh had previously been admonished about that issue. According to the letter, Dr. Enoh acknowledged those improper charges to Dr. Han in a telephone call and also confessed that he had allowed his brother to charge transportation and lodging on the credit card. The second issue pertained to a false statement made by Dr. Enoh to Methodist Hospital. He had told the hospital that he was ill and was unable to work his shift, when in fact Dr. Enoh was traveling for a job interview. The notice letter placed Dr. Enoh on immediate probation, canceled his rotations, and stated Texas Tech's intent to dismiss him from program. It also notified him of the right to appeal.

Dr. Enoh exercised his right of appeal, which resulted in an Appeals Committee Report issued on May 29, 2014. The committee recommended probation, and reinstatement from the suspension. The probationary terms required Dr. Enoh to purchase certain educational materials, prepare a presentation for use by the program, and urged the immediate cancellation of the credit card. The committee's rationale included documentation that Dr. Enoh's brother unilaterally appropriated and used the credit card, and that Dr. Enoh had paid off the outstanding charges.[3]

---

[3] Information about the intent to dismiss Dr. Enoh from the program, and the suspension of his rotation was sent to the Texas Medical Board on May 19, 2014. Texas Tech in August 2014 informed the Board that information was inaccurate.

## Dr. Enoh is Denied Credit for the Last Year of Residency

In June 2014, the Clinical Competence Committee recommended to the program director that Dr. Enoh had not met the requirements for completion of his training. The determination was based on his "repeated pattern of unprofessional behavior and conduct, poor judgment, as well as an intentional disregard for the School policies and procedures." This conclusion was based in part on the credit card issue, but also included additional matters as well.[4] The evaluation form rated Dr. Enoh's professionalism-related questions as unsatisfactory. It also rated other criteria as unsatisfactory, including "appropriate concern for patients and a commitment to carrying out professional responsibilities", recognition of "gaps in knowledge and expertise", and interpersonal communication skills for "effective exchange of information and collaboration with patients, their families and other healthcare professionals." The committee recommended that Dr. Enoh would need to repeat his third year to successfully complete the program.

Dr. Enoh was provided a copy of the Clinical Competency Committee assessment and notified of his right to appeal. In lieu of an appeal, Dr. Enoh was offered a place in Texas Tech's Lubbock program.[5] He did not accept that offer and pursued the appeal. Dr. Namrata Singh, the Pediatrics Residency Program Director, chaired the appeals committee. The committee met with

---

[4] The six month appraisal form, approved by the program director and chair of the Clinical Competence Committee, repeated almost verbatim Dr. Han's May 19th letter to Dr. Enoh, but included this addition:

> In subsequent emails following this action, Dr. Enoh engaged in a series of unprofessional and disrespectful email exchanges with senior faculty to include our, Interim Chair Dr. Pablo Moujan, myself, as well as other school administration. He made a series of false and inappropriate allegations accusing the department of falsifying evaluations and removing documents from his file. These exchanges taken together with the incidents described above do not reflect the integrity, professionalism and high moral, ethical standards that we expect of our residents. Accordingly, Dr. Enoh will continue on probation for the 2014A academic year. He will not receive credit for his entire CA3 training.

[5] Dr. Enoh would not have been able to repeat his third year in El Paso because the program closed at the end of June 2014.

Dr. Han on June 27, 2014. It then met with Dr. Enoh on June 30, 2014. According to Dr. Singh's affidavit:

> Dr. Enoh actively participated in the discussion and engaged the committee. Dr. Enoh and the committee met for over an hour. Dr. Enoh presented the committee with evidence he felt was relevant. Dr. Enoh was given the opportunity to defend his actions and he availed himself of this opportunity. Dr. Enoh spoke at length and addressed the committee regarding his probation.

Dr. Singh denied that anyone yelled at Dr. Enoh, and instead he testified that Dr. Enoh became agitated when asked to respond to specific allegations. Dr. Armando Meza, the Associate Dean for Graduate Medical Education, was also present at the proceeding and similarly swore that Dr. Enoh was given the opportunity to present his views. The committee recommended that the failing evaluation be upheld. Dr. Han accepted that recommendation. In August and September of 2014, Texas Tech made additional offers to Dr. Enoh to repeat his third year at Texas Tech's Lubbock campus, but Dr. Enoh declined.

## The Injunction Hearing

The trial court held a hearing on the plea to jurisdiction and Dr. Enoh's claim for a temporary injunctive relief on the same day. The trial court took additional testimony at the hearing, including that of Drs. Han, Meza, Teissler, and Enoh.[6]

Dr. Meza testified that Dr. Enoh appeared at the June appeal hearing and had an opportunity to speak. The hearing lasted more than an hour and Dr. Enoh spoke for the majority of that time. The voice volume of the participants "increased" but he did not recall any screaming or yelling.

Dr. Enoh testified that prior to the January Clinical Competence Committee meeting, he had had no significant complaints about his performance. He challenged the committee's

---

[6] The trial court gave its oral ruling on the plea to jurisdiction before this testimony was taken, but signed the written order reflecting the ruling sometime later. Both parties freely cite to this testimony in their respective briefs. We assume, but do not decide, that this testimony is part of the evidentiary record for the plea to the jurisdiction.

8

January decision. The committee then reconvened and reconsidered the decision, but reached the same conclusion. Regarding the June appeals hearing, we set out his entire testimony with respect to his ability to speak:

> [Defense Counsel]: I want to ask you a little bit about some of the allegations you've made in your file with the Court here, with your petition. Let me ask you this first. You had an opportunity to speak at that June 2014 appeals committee, did you not?
>
> [Dr. Enoh]: To speak --
>
> [Defense Counsel]: To speak to the appeals committee on June 30th, 2014?
>
> [Dr. Enoh]: Yes, sir.
>
> [Defense Counsel]: And that hearing lasted for over an hour, did it not?
>
> [Dr. Enoh]: About that.
>
> [Defense Counsel]: And during that hour, you had multiple opportunities to directly address the appeals committee; is that correct?
>
> [Dr. Enoh]: Not really.
>
> [Defense Counsel]: So during that hour -- it lasted over an hour, the appeals committee was talking at you the whole time; is that correct?
>
> [Dr. Enoh]: Not entirely.
>
> [Defense Counsel]: Okay. So you did have an opportunity to speak directly to them?
>
> [Dr. Enoh]: I'll say yes.
>
> ….
>
> [Defense Counsel]: But you did have a chance to speak; is that correct?
>
> [Dr. Enoh]: Not on -- the answer is yes, but I think there is more. I would need to give an explanation.
>
> [Defense Counsel]: Fair enough, Your Honor -- fair enough, Dr. Enoh. So at the appeals hearing on June 30th, do you feel like you needed more time?
>
> [Dr. Enoh]: Yes, sir. Not more time, but more room to speak. Not more time, per se, but lengthwise -- but less interruptions were actually needed.

Dr. Teissler testified that at a Clinical Competency Committee meeting, Dr. Moujan was adamant about failing Dr. Enoh out of the ICU rotation. She left the program on April 1, 2014, and was not present when the credit card issue arose or the appeals panel met.

The trial court granted the plea to the jurisdiction in part and denied it in part. The trial court granted the plea as it pertained to Dr. Enoh's discrimination and breach of contract claims, and no issue is raised by either party here as to those now dismissed claims. The trial court also granted the plea as to Texas Tech on the ultra vires claims. The court denied the plea on that same theory, however, as to Drs. Lange and Moujan. The court also denied the plea as to the declaratory relief and denial of due course of law theories. The trial court denied the injunctive relief sought.

## ISSUES ON APPEAL

Texas Tech and the doctors bring four issues for review. First, they contend that Dr. Enoh has not raised a valid due process claim which is necessary for waiving sovereign immunity. This argument has two parts. First, Dr. Enoh has no liberty or property interest in completion of a residency program which is a predicate element for the procedural due process claim (Issue One). The second prong of the argument contends that if any process was due, the evidentiary record here shows it was provided (Issue Two).

Drs. Mouton and Lange in Issue Three claim that Dr. Enoh has not asserted a viable ultra vires claim against them. Finally, in Issue Four, Texas Tech and the doctors contend that the claim for declaratory relief fails because the underlying claims upon which it is premised are barred.

10

**STANDARD OF REVIEW**

The issues before us arise from the denial of a plea to the jurisdiction which included extensive evidentiary support. A plea to the jurisdiction is an appropriate means to challenge the trial court's subject matter jurisdiction of a cause of action. *Bland Independent School Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *see Texas Department of Transp. v. Jones*, 8 S.W.3d 636, 637-38 (Tex. 1999). A governmental unit's sovereign immunity deprives a trial court of subject matter jurisdiction. *Texas Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004); *Tirado v. City of El Paso*, 361 S.W.3d 191, 194 (Tex.App.--El Paso 2012, no pet.); *see Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 512 (Tex. 2012)("Sovereign immunity bars suits against the state and its entities, and this immunity remains intact unless surrendered in express and unequivocal terms by the statute's clear and unambiguous waiver."). Texas Tech and the state actors who work for it are protected by sovereign immunity other than for claims for which immunity has been waived. *Tex. Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011); *Franka v. Velasquez*, 332 S.W.3d 367, 382-83 (Tex. 2011)(state actors sued in official capacity were entitled to derivate immunity). We review the issue of whether a trial court has subject matter jurisdiction *de novo. Miranda*, 133 S.W.3d at 226-27; *State Dept. of Highways and Public Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002).

When a plea to the jurisdiction challenges only the sufficiency of the pleadings, we determine whether the plaintiff has met his burden by pleading facts that affirmatively demonstrate the trial court's subject matter jurisdiction. *Miranda*, 133 S.W.3d at 226. But we construe the pleadings liberally in favor of the plaintiff and look to the pleader's intent, and accept as true the factual allegations in the pleadings. *Id.* at 226, 228. If the pleadings are insufficient to establish jurisdiction but do not affirmatively demonstrate an incurable defect,

11

then the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend. *Id*. at 226-27. However, if the pleadings affirmatively negate the existence of the trial court's jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. *Id*.

When a plea to the jurisdiction includes evidence, and the jurisdictional challenge implicates the merits of the plaintiff's cause of action, the trial court should review the relevant evidence to determine whether a fact issue exists. *Miranda*, 133 S.W.3d at 227, *citing Bland Ind. Sch. Dist.*, 34 S.W.3d at 555. If the evidence raises a fact question regarding the jurisdictional issue, a plea to the jurisdiction may not be granted and the fact finder should resolve the fact issue. *Id.* at 228. However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, then the plea to the jurisdiction may be ruled upon as a matter of law. *Id.* In this way, our review of an evidentiary based plea to the jurisdiction mirrors that of a summary judgment motion under TEX.R.CIV.P. 166a(c). *Miranda*, 133 S.W.3d at 228. The *Miranda* court explained "[b]y requiring the [governmental entity] to meet the summary judgment standard of proof in cases like this one, we protect the plaintiffs from having to 'put on their case simply to establish jurisdiction.'" *Id.* But if there is no fact question on the jurisdiction issue, the trial court should rule on the plea to the jurisdiction as a matter of law. *Id.*

**PROCEDURAL DUE PROCESS IN RESIDENCY PROGRAMS**

Texas Tech's first two issues challenge Dr. Enoh's procedural due process claim. The constitutional claim is essential to Dr. Enoh's pleading as it the means by which he avoids the sovereign immunity bar. *See Stone v. Texas Liquor Control Bd.*, 417 S.W.2d 385, 385-86 (Tex. 1967)(noting deprivation of constitutional right as providing basis for review of agency decision); *McFadden v. Gideon*, 639 S.W.2d 43, 44 (Tex.App.--El Paso 1982, writ ref'd

12

n.r.e.)(same). "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law." Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990)[citations omitted][Emphasis in original). The constitutional claim here is brought under the Texas "due course of law" clause. The textual differences between the Texas provision and the Fifth Amendment to the U.S. Constitution are "without meaningful distinction" and Texas courts can look to federal due process jurisprudence as persuasive authority. *University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995).

Any procedural due process claim starts with a two-step process. First, we must determine whether the interest being asserted rises to the level of a "property" or "liberty" interest. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Than*, 901 S.W.2d at 929. If the answer to that question is yes, then we must weigh the competing interests of the individual and the state to determine what process is constitutionally required. *Than*, 901 S.W.2d at 929.

Texas Tech appropriately begins its analysis with the question of whether Dr. Enoh had a property or liberty interest in the residency program. It suggests that he does not, and therefore any due process claim is foreclosed. Its arguments boil down to this: (1) there is no recognized property or liberty interest in a residency program; (2) any interest is further diminished because this was effectively a dispute over a grade, as distinct from a disciplinary matter; and (3)

13

Dr. Enoh was offered the chance to repeat his failed third year, so the interest here is different than being expelled from the program.

To better appreciate the issue, we briefly digress to explain how physicians complete their training. After graduation from an accredited medical or osteopathic school, graduates will seek out a residency program. Joseph H. King, *The Standard of Care for Residents and Other Medical School Graduates in Training*, 55 AM. U. L. REV. 683, 691 (2006). The residency is a proctorship where the resident learns by doing, with increasing responsibility as the resident progresses through the program. *Id*. at 697. With a medical degree and successful completion of PGY-1, some states will issue a license allowing one to practice medicine. *Id*. at 691, n. 33.[7] Most residents, however, strive to complete the program so they might become board certified in some specialty area. *Id.* at 691-92. This case deals with anesthesiology. The American Board of Anesthesiology administers board certifications in that field. In addition to passing a written test, an applicant for board certification in anesthesiology must have successfully completed an accredited anesthesiology residency program.

Residents work under contract with any accredited graduate medical program. Robert N. Wilkey, *The Non-Negotiable Employment Contract-Diagnosing the Employment Rights of Medical Residents*, 44 CREIGHTON L. REV. 705, 715-18 (2011). While resident contracts vary between programs, they must address certain criteria from the Accreditation Council for Graduate Medical Education ("ACGME"). *Id*. at 724-25. ACGME also sets standards for accredited programs. *Id*. at 726. One of those standards requires a Clinical Competency Committee with a minimum of three program faculty members to evaluate the residents semi-annually. ACGME Common Program Requirements, V.A.1.(a) & (b)(1)(a).

---

[7] The length of the program will depend on the specialty or sub-specialty being pursued. The first year is referred to as PGY-1 ("post graduate year"), and the years thereafter as PGY-2, PGY-3 and so on.

http://www.acgme.org/Portals/0/PFAssets/ProgramRequirements/CPRs_07012016.pdf        (last visited August 5, 2016).

Residency training is hands-on, with the resident physicians providing direct patient care under varying degrees of supervision. *King*, at 697. Residents put in long hours. *Wilkey*, at 709, n.23. (collecting literature on hours worked). Residents are paid for the work they do, but the pay scale is far below what a doctor in private practice might expect.[8]

Against this backdrop, Texas Tech first contends that residents have no firmly established property or liberty interests to complete their residency program. Several cases peripherally address this issue. In *Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001) the court found no protectable *liberty* interest for a resident who was dismissed "for reasons related to her fitness to perform as a doctor." *Shaboon* in turn principally relies on *Board of Curators, Univ. of Mo. v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), where the court rejected a due process challenge by a medical school student who was dismissed from the school because of academic performance. The court in *Horowitz,* however, ultimately assumed the existence of a liberty interest, but found the process given to the student was given was sufficient. 435 U.S. at 84-85, 98 S.Ct. at 952.

We are also guided by the Texas Supreme Court's decision in *University of Tex. Med. Sch. v. Than*, which holds that there is a *liberty* interest in a state institution's graduate education program giving rise to procedural due process protections. 901 S.W.2d 926, 930 (Tex. 1995). *Than* involved a medical student (as distinct from a resident) who was dismissed from medical school for cheating on an exam. *Id*. at 928. The court concluded that a medical student charged

---

[8] Dr. Enoh in his final year at Texas Tech was paid $49,443.00 per annum plus benefits. He claimed to have had a waiting job offer (had he been given his certificate of completion) paying $300,000 per year. The median salary for all physicians in America for 2015 was $187,200 per year. The median salary for specialists in anesthesiology for 2014 was $443,859. *See* Bureau of Labor Statistics, Occupational Outlook Handbook, Physicians and Surgeons, http://www.bls.gov/ooh/healthcare/physicians-and-surgeons.htm#tab-5 (last visited August 3, 2016).

with academic dishonesty faces damage to his or her reputation, the preclusion of gaining admittance at other institutions, and the loss of the chosen profession. *Id.* at 930. Noting the stigma likely to follow that determination, the court recognized a "constitutionally protected liberty interest in [the student's] graduate education" such that they must be afforded procedural due process. *Id.*

Our record is complicated here because Dr. Enoh's present pleading claims only a *property* interest in obtaining a certificate of completion. Both *Than* and *Shaboon* are liberty interest cases. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985) (citations and internal quotations omitted). Neither party here extensively addresses how Texas law might create a property interest. Other courts are split on the existence of a property interest in residency programs, but those decisions turn on the respective controlling state law. *See Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 365 (9th Cir. 1976)("The resident's interest is important enough that he should have notice of his deficiencies, should have an opportunity to examine the evidence against him, and should be allowed to present his side of the story to the decision-maker."); *Ong v. Tovey*, 552 F.2d 305, 308 (9th Cir. 1977)(same); *Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 783 (2d Cir. 1991)("Accordingly, we agree with the district court that Ezekwo's expectation of performing the duties of Chief Resident was reasonable and well founded and rose to the level of a property interest entitled to the protections afforded by the Due Process Clause."); *but see Trotter v. Regents of U. of New Mexico*, 219 F.3d 1179, 1184 (10th Cir. 2000)(Under New Mexico law, medical student failed to identify either property or liberty interest arising under that state's laws); *Davis v. George Mason U.*, 395

16

F.Supp.2d 331, 336 (E.D.Va. 2005), *aff'd,* 193 Fed. Appx. 248 (4th Cir. 2006)(not designated for publication)(plaintiff did not show property interest under Virginia law to continued enrollment in graduate program). The Texas law cited to us does not address the issue directly. *Than*, 901 S.W.2d at 930, n.1 ("Because we conclude that Than at least has a liberty interest in his graduate education, we need not decide and express no opinion on whether graduate students have a property interest in their education at state universities.); *Tobias v. U. of Texas at Arlington*, 824 S.W.2d 201, 209 (Tex.App.--Fort Worth 1991, writ denied), *cert denied*, 506 U.S. 1049 (1993)("Although we have serious doubts as to a constitutionally protectable property right in a grade or in a grade grievance procedure, we need not decide that issue in this case."); *Smith v. Davis*, 507 Fed. Appx. 359, 363 (5th Cir. 2013)(unpublished)(deciding only that property interest in a grade was not "clearly established" and thus instructor was entitled to qualified immunity).

The distinction between property and liberty interests is complicated further by our standard of review for pleas to the jurisdiction. We cannot dismiss the case for a pleading deficiency which might be corrected, and instead must remand the case. Accordingly, we view the case as both involving a claimed property and liberty interest. But given the record and briefing in this case, we will merely assume without deciding that there is a property or liberty interest worthy of procedural due process protection. We do so because on the unrebutted factual showings made by Texas Tech, Dr. Enoh was provided all the process that is due for such interests, assuming that they exist.[9]

---

[9] We are not the first court to choose this path. In *Regents of U. of Michigan v. Ewing*, 474 U.S. 214, 222-23, 106 S.Ct. 507, 511-12, 88 L.Ed.2d 523 (1985), the court assumed the existence of a property right giving rise to a substantive due process claim, and then held the defendant school had not violated the substantive due process rights of the plaintiff. It did so following Justice Brandeis' admonition not to "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936)(concurring opinion); *see also Horowitz*, 435 U.S. 78, 84-85 (1978)(assuming but not deciding liberty or property interest of medical student); *Davis v. Mann,* 882 F.2d 967, 974 (5th Cir.1989)(raising property interest question, but ultimately deciding case on sufficiency of process provided resident dismissed from dental program); *Tobias*, 824 S.W.2d at 209 (assuming existence of property interest). If we were to

17

## Sufficiency of Process Given

The amount of process due is measured by a "flexible standard" that turns on the "practical requirements of the circumstances." *Than*, 901 S.W.2d at 930, *citing Mathews v. Eldridge*, 424 U.S. at 334, 96 S.Ct. at 902, and *Goss v. Lopez*, 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975). This flexible standard includes: "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Than*, 901 S.W.2d at 930, *citing Mathews,* 424 U.S. at 335, 96 S.Ct. at 903.

In deciding the amount of process that is due, two additional questions must be answered. First, is a residents' dismissal more akin to a student-teacher issue, or an employee-employer matter? Under prevailing case law, the former is entitled to less process than the latter. Second, is the action an academic determination or is it a disciplinary proceeding? Again, the former is entitled to less process than the latter. We conclude the issues here find their origin in the student-teacher relationship, and while somewhat less clear, we conclude this was an academic decision. But even as a disciplinary matter, we find the evidence here sufficient to show the process was sufficient given the challenges asserted by Dr. Enoh.

## Educational Versus Employment Situations

Dr. Enoh worked regular shifts, provided medical services to patients, and was paid an annual salary. If viewed as employment relationship, procedural due process would require pre- and post-termination procedures. *Loudermill*, 470 U.S. at 547-48 (describing level of formality

make far reaching holdings on the existence or non-existence of property or liberty interests of resident students, we would likewise venture further than necessary to decide the instant dispute. These are significant issues that deserve a more complete record and briefing than we have before us.

18

for each type procedure). At the same time, Dr. Enoh was supervised by clinical professors in an educational environment. Under Fifth Circuit case law, "medical residents are not employees protected by the due process clause." *Shaboon*, 252 F.3d at 732, *citing Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989). This is so because a "residency program is distinct from other types of employment in that the resident's 'work' is what is academically supervised and evaluated." 882 F.2d at 974. "Successful completion of [a] residency program depends upon subjective evaluations by trained faculty members into areas of expertise that courts are poorly equipped to undertake in the first instance or to review." *Id.* at 974. Accordingly, residents are treated like students for due process purposes, and "are not entitled to as much procedural protection under the Fourteenth Amendment as employees who are terminated from their jobs." *Id.* at 973. We agree with *Shaboon*'s reasoning in this regard.

## Academic vs. Discipline Decisions

When a student is dismissed for *disciplinary* reasons, the Fourteenth Amendment requires that "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581, 95 S.Ct. at 740. Presenting the student's side of the story may, however, include no more than requiring at least an "informal give-and-take" between the student and the administrative body that would give the student "the opportunity to characterize his conduct and put it in what he deems the proper context." *Id.,* at 584, 95 S.Ct. at 741. But *academic* dismissals "call[ ] for far less stringent procedural requirements," *Horowitz,* 435 U.S. at 86, 98 S.Ct. 948. In *Horowitz*, a student academically dismissed from medical school, received sufficient process when the school informed her of the faculty's dissatisfaction, and the ultimate decision was made carefully and deliberately. *Id.* at 85, 98 S.Ct. at 952.

19

*Horowitz* based this conclusion on a number of arguments. First, courts have historically avoided imposing hearing requirements challenging academic dismissals. *Id*. at 87, 98 S.Ct. at 953. Next, while "suspensions of students for disciplinary reasons have a sufficient resemblance to traditional judicial and administrative factfinding," a school itself is fundamentally "an academic institution, not a courtroom or administrative hearing room." *Id*. at 88-89, 98 S.Ct. at 954. "Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full-hearing requirement" and they require "an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id*. at 89-90, 98 S.Ct. at 955. Third, the court was concerned that imposing court-like procedures into an educational environment would damage the faculty student relationship upon which the educational system depends. *Id*. The more advanced the educational environment, the more these policy concerns apply. *Id*.

Thus, the court concluded that in the case of dismissal for academic reasons, "a hearing is not required by the Due Process Clause of the Fourteenth Amendment." *Horowitz*, 435 U.S. at 86 n.3, 98 S.Ct. at 953; *Tobias v. Univ. of Tex. at Arlington*, 824 S.W.2d 201, 209 (Tex.App.--Fort Worth, 1991, writ denied); *but see Than*, 901 S.W.2d at 931 (noting distinction but reserving ruling on difference in degree of process which might be due). But more limited process does not mean no process. Students who are academically dismissed must still "be given some meaningful notice and an opportunity to respond." *Davis,* 882 F.2d at 975, *citing Mathews,* 424 U.S. at 333, 96 S.Ct. 893; *see also Horowitz,* 435 U.S. at 85, 98 S.Ct. at 948 (holding that student received all the due process that the Fourteenth Amendment required where "[t]he school

20

fully informed [her] of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment.").

This case does not fit neatly as a dismissal for academic reasons or misconduct. The Texas Supreme Court in *Than* had little trouble concluding that cheating on a test was a disciplinary matter. *Than*, 901 S.W.2d at 931. And misuse of a credit card, particularly as found here, carries similar overtones of wrongful conduct. But academic dismissals can include expulsion for more than simply bad grades. It may include reasons such as personal hygiene and tardiness as these "may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness." *Horowitz,* 435 U.S. at 91 n. 6, 98 S.Ct. at 955; *see also Perez v. Texas A&M University at Corpus Christi*, 589 Fed.App'x 244, 249 (5th Cir. 2014)("[c]ourts have frequently concluded . . . that absences and tardiness in the higher education context may relate to a student's ability to perform academically and professionally."). Academic dismissals might also include interpersonal conflicts. *Hennessy v. City of Melrose,* 194 F.3d 237, 251 (1st Cir.1999)(student teacher deemed to be dismissed for academic reasons based on interpersonal confrontations with staff which would impair "his capacity to function professionally in a public school setting."). The United States Court of Appeals for the Seventh Circuit had "no difficulty" deciding that a medical resident was dismissed for academic reasons because he failed to disclose on his application an earlier dismissal from another residency program. *See Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005); *see also Al-Dabagh v. Case W. Reserve U.*, 777 F.3d 355, 358 (6th Cir. 2015), *cert. denied,* 135 S.Ct. 2817 (2015)(asking professor to lie about attendance, inappropriate behavior at party, and conviction for DWI were professionalism concerns ill-suited for judicial resolution).

A federal district court surveying the law in this area concluded that courts have found a dismissal as academic "where a student's scholarship or conduct reflects on the personal qualities necessary to succeed in the field in which he or she is studying and is based on an at least partially subjective appraisal of those qualities." *Allahverdi v. Regents of U. of New Mexico*, 05-277 JB/DJS, 2006 WL 1313807, at *13 (D.N.M. Apr. 25, 2006). That definition fits the situation here, because one of the standards by which the program judged its candidates, and which is required by the American Board of Anesthesia, is professionalism. Texas Tech concluded that Dr. Enoh did not meet the standards for professionalism, which at least partially include subjective appraisals.

Given the circumstances, we conclude that Dr. Enoh received all the process that was due. Texas Tech's first action taken in January resulted in Dr. Enoh not passing the first half of his PGY-3 training. His petition acknowledges that he received notice of this decision. A review form states that he refused to sign the acknowledgment, so the form, which explains the criticisms, was at least available to him.[10] He in fact challenged the Clinical Competency Committee's initial determination, and the committee reconvened with a larger panel and reaffirmed the decision. It directed his mentor to develop a remediation plan.

Dr. Enoh complains that he was not given copies of various emails that circulated between members of the teaching staff about him. He also complains that he was not allowed to attend and participate in the Clinical Competency Committee meeting. These arguments implicate the burden to the institution which is part of the procedural due process inquiry. *Horowitz*, 435 U.S. at 90, 98 S.Ct. at 955. We can easily envision the chilling effect on the open

---

[10] A comments section to the form states: "During the Clinical Competency Committee meeting on January 21st, 4:00 PM, it was recognized that Dr. Enoh performed unsatisfactory in professionalism during the Part B of 2013. Dr. Enoh received marginal pass for his remedial rotation for SICU. His evaluation reported unprofessionalism. During his regional anesthesia rotation, he did not follow up the patients and left the work place without telling. The issues of poor work ethics and attitude have been raised by faculties in various areas."

22

discussion of a student-doctor's competence if the student-doctor must be present. We can also envision the chilling effect on inter-department communications if all of those communications must be turned over to the student as if they were discoverable matters. More importantly, the Clinical Competency Committee serves only an advisory role. The actual decision to advance a resident resides with the program director. Dr. Enoh is essentially seeking to impose procedural due process burdens on an advisory board when he acknowledges that he had access to, and frequent communications with, the program director who was the actual decision-maker.

We also are less sure of the significance of the January decision in light of later events. In June, Dr. Enoh was found to have failed the second half of his third year based on events that occurred after the January decision. By failing his last six month term he would not have been given a certificate of completion in any event.[11] Dr. Enoh's petition does not seek credit for the first half of PGY-3; rather it seeks to compel Texas Tech to issue a certificate of completion for the entire third year.

The next event referenced in the petition is Texas Tech's May 2014 notice of suspension and intent to dismiss Dr. Enoh from the program. He appealed that action and partially prevailed, obtaining his privileges back, avoiding dismissal, and then meeting the terms of a probation.[12]

The final issue involves the Clinical Competence Committee's recommendation in June 2014 that Dr. Enoh had not successfully completed the last half year of the program and should not receive credit for the final year of his residency. That determination was based on the credit

---

[11] One requirement for board certification from the American Board of Anesthesiology is a satisfactory rating in final six month period of anesthesiology residency rotation. Thus even if the first half of the final year was satisfactorily completed, Dr. Enoh would still not have been eligible to sit for the written board certification testing.

[12] In that time period, Texas Tech concedes that it improperly notified the Texas Medical Board that Dr. Enoh had been dismissed from the program. Texas Tech later corrected the misinformation. Dr. Enoh does not allege how any different process would have prevented that mistake, and we attach no significance to it from the standpoint of the procedural due process claim.

23

card issue but also included additional matters, such as inappropriate communications with the faculty, failing to show appropriate concerns for patients, recognizing his gaps in knowledge, and lack of interpersonal communication skills. While his petition claims he did not have a right to speak or present any evidence during the appeal, the sworn testimony and affidavits show otherwise. Dr. Enoh spoke for most of the hearing. At best, he testified that his presentation was interrupted. We are aware of no authority that requires as a matter of due process the right to speak unchallenged in any setting, much less an informal one as was at issue here. In fact, the essence of what procedural due process requires is a give and take.[13]

At the hearing below, Dr. Enoh also contended that he never received adequate notice of the issue that was actually before the appeals committee. The letter that Dr. Han sent advising him that he would not receive credit for PGY-3 states: "As a result of you being placed on consecutive *probations* during Part B 2013 and Part A 2014 academic years, you will not receive credit for your CA 3 training." [Emphasis added]. Testimony at the injunction hearing, however, showed that Dr. Enoh was not placed on probation by the Clinical Competency Committee; rather they simply recommended that he receive an unsatisfactory rating. From this discrepancy, Dr. Enoh reasons he was given inadequate notice of the adverse action because he did not know what the real issue was before the appeals committee. But the same letter attached the actual clinical competency report which summarizes the underlying complaints about Dr. Enoh's professionalism. While Texas Tech officials may have misused the term "probation" in describing their actions, they informed Dr. Enoh of the factual issues that led to their decision.

---

[13] Dr. Enoh also emphasizes that Texas Tech did not follow its own policies in the appeal process. The procedural due process inquiry, however, focuses on what is constitutionally required, and not whether particular written policies were followed. *See Shah v. U. of Texas S.W. Med. Sch.*, 54 F. Supp. 3d 681, 706 n.15 (N.D. Tex. 2014); *Jackson v. Texas S. U.-Thurgood Marshall Sch. of Law*, 231 S.W.3d 437, 440 (Tex.App.--Houston [14th Dist.] 2007, pet. denied).

Because Texas Tech demonstrated that Dr. Enoh received all the process that was due, he has not asserted a viable procedural due process claim that can overcome Texas Tech's sovereign immunity. We accordingly sustain Issue Two.

## ULTRA VIRES

Dr. Enoh alleged that Drs. Moujan and Lange acted arbitrarily, capriciously, and outside their legal authority "by failing to comply with the Appeals Policy and by denying [Dr. Enoh] due process." Suits that require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity. *Heinrich,* 284 S.W.3d at 372. To fall within this *"ultra vires"* exception, however, a suit must not complain of a government officer's exercise of discretion, but instead must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act. *Id.* "Thus, ultra vires suits do not attempt to exert control over the state--they attempt to reassert the control of the state." *Id.*

Applying these precepts, we conclude the trial court erred in not sustaining the plea to the jurisdiction as to both Drs. Moujan and Lange. We have already concluded that for the actions raised in the petition, Dr. Enoh received sufficient process. Accordingly, neither Dr. Moujan nor Dr. Lange could be guilty of ultra vires act resulting in the deprivation of procedural due process.

That leaves Dr. Enoh's allegation that the doctors committed ultra vires acts in following Texas Tech's policy for appeals. Nothing in the pleading explains what ministerial duty these specific doctors failed to discharge in regard to the appeal process. The evidence from the plea to the jurisdiction shows that other staff members handled the appeals. We conclude that Drs. Moujan and Lange have shown there is no factual issue raising a valid ultra vires claim as to them. We therefore sustain Issue Three.

25

## DECLARATORY RELIEF

In Issue Four, Texas Tech contends that the declaratory relief sought in the petition cannot overcome Texas Tech' sovereign immunity. The Uniform Declaratory Judgment Act (UDJA) allows parties "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX.CIV.PRAC.&REM.CODE ANN. § 37.002(b)(West 2015). But the UDJA does not enlarge a trial court's jurisdiction. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 370-71 (Tex. 2009). In particular, other than as specifically allowed, the UDJA does not allow parties to circumvent the State's sovereign immunity by re-characterizing a barred suit as one that is not. *See Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002); *Koch v. Texas Gen. Land Off.*, 273 S.W.3d 451, 455 (Tex.App.--Austin 2008, pet. denied). Thus, immunity will bar even an otherwise proper declaratory relief suit that has the effect of establishing a right to relief against the State or its political subdivisions for which the Legislature has not waived immunity. *Sawyer Trust,* 354 S.W.3d at 388. *Id.*

The Texas Supreme Court's decisions in *City of El Paso v. Heinrich* and *Texas Dept. of Transp. v. Sefzik*, 355 S.W.3d 618, 620 (Tex. 2011) guide us here. In *Heinrich*, a pensioner sued the City of El Paso and several government officials, claiming they violated her statutory rights when they reduced her pension benefits. 284 S.W.3d at 369-70. The suit sought a declaration that the defendants acted without authority in reducing the benefits. *Id.* The supreme court held that claim "cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity." *Id.* at 373. The court thus allowed the pensioner to pursue her claims for prospective relief against the state officials, but required the dismissal of the claims against the city and the other governmental entities. *Id.* at 379-80. The issue arose again in *Texas Dept. of Transp. v. Sefzik* when a sign company sought a declaration

against TXDOT that the company was entitled to an administrative hearing from the denial of its application to place a sign. 355 S.W.3d at 620. Only TXDOT was sued in that case. The supreme court concluded the declaratory relief likewise should be dismissed, holding that "the UDJA does not waive the state's sovereign immunity when the plaintiff seeks a declaration of his or her rights under a statute or other law." *Id.* at 621. The UDJA would, however, waive sovereign immunity for declaratory judgment actions that challenge the validity of an ordinance or statute. *Id*. at 622.[14] In this way, ultra vires and declaratory relief claims are interconnected, with the relief sought dictating which defendant is an appropriate party to each type of claim.

Applying these principles, we conclude the trial court erred in not dismissing the declaratory relief claim as to Texas Tech. Dr. Enoh does not challenge the validity of any statute or ordinance, but rather only seeks compliance with the graduate program contract and the policies that are attendant to that contract. Accordingly, Texas Tech is not a proper party to that claim. We have previously addressed the ultra vires claims as to the individual defendant doctors. While an ultra vires claim might be appropriate to compel compliance with non-discretionary duties, the claims against the individual defendant doctors are either unrelated to the appeals process, or the ultimate relief sought goes well beyond compelling a non-discretionary duty (i.e. it seeks to compel the imposition of a passing grade which is in part subjectively judged). For this reason, we sustain Issue Four.

### CONCLUSION

We decline to resolve Issue One which contends that Dr. Enoh lacks any property right, but sustain Issue Two and conclude that Texas Tech and the defendant doctors provided any

---

[14] The Supreme Court found an explicit waiver of immunity for this class of declaratory relief claims in Section 37.006(b)'s language requiring the joinder of a governmental unit for any proceeding that involves the validity of a municipal ordinance or franchise, and service of notice of the suit on the attorney general for an suit alleging that a statute, ordinance, or franchise is unconstitutional. *Id*. at 622, *quoting* TEX.CIV.PRAC.&REM.CODE ANN. § 37.006(b)(West 2015).

procedural due process rights which were due. We sustain Issue Three as to the ultra vires claims against Dr. Richard Lange and Dr. Pablo Moujan. We sustain Issue Four and conclude that sovereign immunity is not waived by the UDJA allegation. We render judgment dismissing the remaining claims for lack of subject matter jurisdiction.

December 14, 2016

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

28