# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00671-CV

**Michael Motheral in his Official Capacity as Chair of the University Interscholastic League's State Executive Committee; Johanna Denson in her Official Capacity as Vice Chair of the UIL SEC; Paul Galvan in his Official Capacity as a member of the UIL SEC; and Daryl Wade in his Official Capacity as a member of the UIL SEC, Appellants**

v.

**Jennifer Black, individually, and A.B., a minor, by and through his guardian, Jennifer Black, Appellees**

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-21-006732, THE HONORABLE MARIA CANTÚ HEXSEL, JUDGE PRESIDING

## CONCURRING AND DISSENTING OPINION

I concur with the Court to the extent that it reverses in part the district court's denial of the plea to the jurisdiction and renders judgment dismissing those claims. I respectfully dissent, however, to the extent that the Court affirms both the district court's denial of the plea and the temporary injunction. In my opinion, the district court lacks jurisdiction over the claims brought by A.B. and his mother Jennifer Black (collectively, the Plaintiffs), and I would reverse the district court's order and render judgment dismissing all claims.

This appeal concerns A.B.'s entitlement to participate in UIL athletics during his senior year at Duncanville High School after moving from Coppell High School. The Plaintiffs participated in a hearing before the UIL District Executive Committee (DEC), and the DEC determined that A.B. moved for athletic purposes, rendering A.B. ineligible to play at

Duncanville for one year under the UIL Rules. The Plaintiffs appealed to the UIL State Executive Committee (SEC), but the SEC affirmed the DEC determination after another hearing.

"[T]he UIL is a governmental unit subject to sovereign immunity," and there is no judicial review of UIL decisions under the Administrative Procedure Act. *See University Interscholastic League v. Southwest Offs. Ass'n*, 319 S.W.3d 952, 957, 962 (Tex. App.—Austin 2010, no pet.). Thus, the Plaintiffs sought judicial intervention by another route: suing SEC members (the UIL Defendants) under ultra vires constitutional theories—including that the UIL Defendants did not provide the Plaintiffs sufficient due course of law—and seeking declaratory and injunctive relief from the UIL ineligibility determination. But the ultra vires exception to sovereign immunity is limited to whether the UIL Defendants acted ultra vires, regardless of whether the UIL decision was correct or incorrect. *Cf. City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009) ("To fall within this *ultra vires* exception, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act."); *University of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 931 (Tex. 1995) (noting that "due course of law" does not ensure "process is accurate and without error").

The UIL Defendants filed a plea to the jurisdiction asserting that the Plaintiffs did not plead sufficient facts supporting a viable ultra vires constitutional claim to overcome sovereign immunity. *See Andrade v. NAACP of Austin*, 345 S.W.3d 1, 11 (Tex. 2011) (noting that governmental officials "retain[] immunity from suit unless [the plaintiffs] have pleaded a viable claim"). The district court denied the plea and granted a temporary injunction prohibiting the UIL Defendants from enforcing the ineligibility determination. The Court today reverses portions of the order denying the plea to the jurisdiction and renders judgment dismissing most

2

of the Plaintiffs' claims but affirms both the denial of the plea as to the Plaintiffs' remaining due course of law claim and the temporary injunction based on that claim.

"[T]he right to participate in extracurricular activities is not a fundamental right," and "judicial intervention in matters such as these often does more harm than good." *In re University Interscholastic League*, 20 S.W.3d 690, 692 (Tex. 2000) (orig. proceeding) (citing *Eanes Indep. Sch. Dist. v. Logue*, 712 S.W.2d 741, 742 (Tex. 1986)). In 2005, the Texas Supreme Court expressly directed courts of appeals to take heed:

> We have twice reminded the lower courts that "judicial intervention in [student athletic disputes] often does more harm than good." As the Fifth Circuit has said, judges are not "super referees". Along the same vein, the United States Supreme Court has observed: "Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." We reiterate this counsel to the trial court and courts of appeals.

*National Collegiate Athletic Ass'n v. Yeo*, 171 S.W.3d 863, 870 (Tex. 2005) (internal footnotes omitted and alterations in original) (quoting *University Interscholastic League*, 20 S.W.3d at 692; *Logue*, 712 S.W.2d at 742; *Hardy v. University Interscholastic League*, 759 F.2d 1233, 1235 (5th Cir. 1985); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)).

Nevertheless, the Court today invites further attempts by litigants to invoke judicial intervention into UIL matters by permitting an alleged due course of law claim to serve as the basis supporting the district court's temporary injunction barring enforcement of the UIL ineligibility determination. *Cf. Texas S. Univ. v. Villarreal*, 620 S.W.3d 899, 907 n.4 (Tex. 2021) (expressing concern that holding that "dismissal [from law school] implicated a liberty interest would open the floodgates for lawsuits"). And litigants may often achieve the result that they desire—perhaps for the duration of the athletic season at issue—while courts consider

3

the merits, as occurred here under Rule 29.3. *See Motheral v. Black*, No. 03-21-00671-CV, 2022 WL 363363, at \*1 (Tex. App.—Austin Feb. 7, 2022, order) (per curiam) (reinstating temporary injunction pending consideration of merits on appeal (citing Tex. R. App. P. 29.3)).

I dissented to the Court's Rule 29.3 order, and I respectfully dissent today to the extent that the Court concludes that the district court had jurisdiction over the Plaintiffs' claims. I cannot agree that the Plaintiffs pleaded a viable due course of law claim justifying judicial intervention: the UIL ineligibility determination did not implicate a protected liberty interest; even if a liberty interest were implicated, the UIL Defendants provided the Plaintiffs with due process; and even if due process were lacking, the Plaintiffs did not request the relief they would be entitled to—namely, more process.

## LIBERTY INTEREST

The Texas Supreme Court has held that "a student has no interest in participating in extracurricular activities that is protected by the Texas Constitution's guarantee of due course of law." *Yeo*, 171 S.W.3d at 868. To circumvent this holding, the Plaintiffs have alleged the following two liberty interests: "Jennifer's fundamental liberty interest in determining the care, custody, and control of her children and in the right to control their education" (the parental liberty interest), and the Plaintiffs' "liberty interest in their good name, reputation, honor, and integrity" (the reputation liberty interest). *See Villarreal*, 620 S.W.3d at 905 (describing two-part inquiry of whether liberty or property interest is protected and if so, whether government official followed due course of law in depriving plaintiff of that interest).

In support of her alleged parental liberty interest, Jennifer averred that she "made the decision to move my family, including myself and my son A.B., to ensure the safety and

4

security of my family, and not for any athletic purpose." But the UIL ineligibility determination did not impinge on her ability to move her family to Duncanville or to enroll A.B. in Duncanville High School. *See Cornerstone Christian Sch. v. University Interscholastic League*, 563 F.3d 127, 136 (5th Cir. 2009) ("Parents have a fundamental interest in raising and educating their children. . . . The parents' right protects their prerogative to make choices regarding the type of education—e.g., public, private, or home-schooling—that their child receives but not particular components of that education, such as participation in interscholastic athletics or enrollment in particular courses."). On appeal, the Plaintiffs argue:

> The evidence establishes that [the UIL Defendants'] conduct had the effect of chilling Jennifer's liberty interest, as that conduct effectively signaled to Jennifer and parents of student-athletes throughout this state that a move for safety and security purposes could result in, among other things, themselves and their families being publicly branded by UIL officials as having violated UIL rules.

The Plaintiffs, in effect, are arguing not that the UIL determination impinges on Jennifer's actual parental liberty interest to move her family for safety and security—an action that the athletic ineligibility determination does not proscribe—but that it "chill[s]" this interest from being exercised in the future, either by her or "parents of student-athletes throughout this state." However, although the "chilling" of *protected speech* implicates an overbreadth doctrine in the context of the constitutional protections of the freedom of speech, *see Kinney v. Barnes*, 443 S.W.3d 87, 97 (Tex. 2014) ("Overbroad restrictions on speech are unconstitutional because of their potential to chill protected speech."); *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) ("The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere."), Plaintiffs have not identified—nor have I found—any authority for concluding that a similar "chilling" or overbreadth doctrine

5

applies to the circumstances here in the context of a due course of law claim, *cf. United States v. Salerno*, 481 U.S. 739, 745 (1987) (noting that "we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment"); *Ollie v. University of Conn.*, 364 F. Supp. 3d 143, 151 (D. Conn. 2019) (collecting cases and noting "courts have repeatedly declined to apply the chilling doctrine outside of the limited context of free speech and free expression claims under the First Amendment"). Accordingly, I cannot conclude that the Plaintiffs' alleged parental liberty interest was implicated by the UIL Defendants' determination.

As to their alleged reputation liberty interest, the Plaintiffs assert that the "[UIL] Defendants caused Plaintiffs to suffer reputational harm in their 'good name, reputation, honor, and integrity' by broadcasting their decision declaring that A.B. transferred schools for prohibited athletic purposes," relying on *Than*, 901 S.W.2d at 930 ("[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of due process must be satisfied.").[1] In *Than*, a medical student at a public university was dismissed for academic dishonesty. *Id.* at 928. The Texas Supreme Court held that the medical student "has a constitutionally protected liberty interest in his graduate education" because a "medical student charged with academic dishonesty faces not only serious damage to his reputation but also the loss of [the student's] chosen profession as a physician"

---

[1] The Court cites a 1961 case from the Fifth Circuit as the primary authority for concluding that "the Plaintiffs pleaded a liberty interest that warrants due-process protection." *Ante* at ___ (citing *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 157 (5th Cir. 1961), *abrogation on other grounds recognized by Walsh v. Hodge*, 975 F.3d 475 (5th Cir. 2020)). *Dixon* preceded the modern analytical framework for determining whether a "liberty interest" is implicated. Regardless, the interest at stake in *Dixon* did not concern an analogous interest to here, but rather "the right to remain at a public institution of higher learning in which the plaintiffs were students in good standing" when "[w]ithout sufficient education the plaintiffs would not be able to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens." 294 F.2d at 157.

6

with a "stigma" "likely to follow the student and preclude him from completing his education at other institutions." *Id.* at 930. *Than* is therefore consistent with case law that requires more than reputational injury to implicate a legitimate liberty interest. *See Yeo*, 171 S.W.3d at 868 & n.16 (noting that "the United States Supreme Court has held that reputation alone is not a protected liberty or property interest" (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976))); *Christopher v. State*, No. 03-06-00483-CV, 2008 WL 5423236, at *5 (Tex. App.—Austin Dec. 31, 2008, no pet.) (mem. op.) (collecting cases holding that reputation alone is insufficient to implicate legitimate liberty interest); *University Interscholastic League v. Hatten*, No. 03-03-00691-CV, 2004 WL 792328, at *2 (Tex. App.—Austin Apr. 15, 2004, no pet.) (mem. op.) ("The UIL, citing *Paul v. Davis*, correctly states that reputation alone is not a protected liberty or property interest."); *Boyne v. Harrison*, 647 S.W.2d 82, 84 n.2 (Tex. App.—Austin 1983, writ dism'd by agr.) ("But, reputation alone, apart from some more tangible interest is not sufficient to invoke the procedural protection of the due process clause."); *see also Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 6–7 (2003) (noting that in *Paul*, "we held that mere injury to reputation, even if defamatory, does not constitute the deprivation of a liberty interest").

I cannot conclude that the circumstances here rise to the level of the implicated liberty interest in *Than*. The UIL Defendants' athletic ineligibility determination concluded that the Plaintiffs failed to satisfy their burden under UIL Rule 410 "to establish by the preponderance of the evidence that he or she is eligible" by showing that A.B. did not transfer for athletic purposes. Under the UIL Rules, transferring for athletic purposes is not "misconduct" or analogous to "academic dishonesty"; rather, it is a criterion for determining eligibility to participate in UIL athletic competitions at the school to which the student transferred. *Cf. Villarreal*, 620 S.W.3d at 907 ("But Villarreal was not involved in the alleged

7

cheating, and he has not explained how any disciplinary stigma could attach to him as a result of the School's response."). While the charge of academic dishonesty at issue in *Than* may have resulted in "the loss of [the student's] chosen profession as a physician" or may have precluded a student from "completing his education at other institutions," 901 S.W.2d at 930, here, in contrast, UIL Rule 443(f)(3) expressly contemplates that notwithstanding an athletic ineligibility determination, a student may still remain eligible to play in UIL competitions, although not at the school to which that student transferred: "[A] student who has established varsity eligibility under this section at a member school but who subsequently enrolls in another member school and is found to have changed schools for athletic purposes remains eligible at the school, where eligibility was first established."[2] *Cf. Villarreal*, 620 S.W.3d at 907 (noting that law school student dismissed for academic performance "was free to apply for readmission to the School after two years or to seek admission to another law school" and that "proof that an academic dismissal for poor performance made an individual somewhat less attractive to other institutions or employers would not demonstrate stigma"); *Yeo*, 171 S.W.3d at 868 (rejecting argument that liberty interest due to reputational injury is implicated because "people would have suspected

---

[2] UIL Rule 443(f)(3) is made "[s]ubject to Section 403(f) and 463(2)(A)." UIL Rule 463(2)(A) provides, "A student who is found by a District Executive Committee, or upon appeal, the State Executive Committee, to have changed schools for athletic purposes or other impermissible reasons may return within thirty (30) days after being ruled ineligible to the school the student left without need of a parent residence waiver as long as all other eligibility rules are satisfied." UIL Rule 403(f) provides, in part, "A student who has established varsity eligibility under this section at a member school but who subsequently changed schools to another member school zone and is found to have changed schools for an impermissible reason, remains eligible at the school where eligibility was first established within thirty (30) days of being found ineligible at the school the student moved to for this provision to apply."

that it was for her own misconduct and not for UT-Austin's mistakes in attempting to comply with NCAA rules" "[h]ad she been disqualified from competing in the championship meet").[3]

Accordingly, I conclude that the Plaintiffs have not asserted a legitimate liberty interest implicated by the UIL determination. *See Yeo*, 171 S.W.3d at 870 (holding that plaintiff suing over athletic ineligibility ruling "has asserted no interests protected by article I, section 19 of the Texas Constitution" and that "[t]he case must therefore be dismissed").

**DUE PROCESS**

Even if the Plaintiffs had alleged a protected liberty interest that was implicated by the UIL ineligibility determination, I would still render judgment dismissing their due course of law claim because they received at least as much process as the Constitution required. *See Villarreal*, 620 S.W.3d at 908–10 (assuming without deciding property interest was implicated and rendering judgment dismissing case after concluding plaintiff "received at least as much

---

[3] Both the Plaintiffs and the Court rely on this Court's 2004 decision that briefly discussed—without much analysis or factual description—how the "stigmatizing effect of the UIL's actions" could implicate the parents' liberty interest. *Ante* at ___ (quoting *University Interscholastic League v. Hatten*, No. 03-03-00691-CV, 2004 WL 792328, at *2 (Tex. App.—Austin Apr. 15, 2004, no pet.) (mem. op.)). But *Hatten* concerned an appeal of a temporary injunction and did not consider whether jurisdiction existed over the due course of law claim. *See* 2004 WL 792328, at *4 ("[W]e cannot say that the orders [granting temporary injunctions] were so arbitrary as to exceed the bounds of reasonable discretion. . . . We do not review the case on its merits; our review is confined to whether the district court abused its discretion in granting the temporary injunctions based on the record."); *see also Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 555 n.12 (Tex. 2019) (noting that "we simply cannot ascribe to tacit acceptance the same significance we would give to an express consideration and analysis of the [jurisdictional] issue"). Moreover, *Hatten* preceded *Villarreal* and *Yeo*, which together constrain an expansive interpretation of *Than*, as I have shown above. *See, e.g.*, *Hatten*, 2004 WL 792328, at *3 (citing *National Collegiate Athletic Ass'n v. Yeo*, 114 S.W.3d 584, 598 (Tex. App.—Austin 2003), *rev'd*, 171 S.W.3d 863 (Tex. 2005)). To the extent that *Hatten* could be interpreted as analogous to the situation here—a difficulty given the scarce facts described in that case—I conclude it would not control here given the different standard of review and the intervening decisions from the Texas Supreme Court.

9

process as the Constitution required in connection with his dismissal" from law school). The Court relies on three alleged omissions or actions relating to process provided by the UIL Defendants to conclude that the Plaintiffs pleaded a valid ultra vires claim that the process was insufficient: (1) failing to question the Plaintiffs about abuse after the Plaintiffs' counsel requested the UIL Defendants to do so, (2) telling the Plaintiffs' counsel to "wrap up" twice during the closing argument, and (3) failing to provide the Plaintiffs' counsel with an opportunity to make an opening statement.[4] *Ante* at ___. I disagree that these allegations constitute a basis for a valid ultra vires claim that the UIL Defendants deprived the Plaintiffs of due course of law. *See Matzen v. McLane*, No. 20-0523, ___ S.W.3d ___, ___, 2021 WL 5977218, at *4 (Tex. Dec. 17, 2021) ("If, however, the actions alleged to be ultra vires were not truly outside the officer's authority or in conflict with the law, the plaintiff has not stated a valid ultra vires claim and therefore has not bypassed sovereign immunity.").

First, I disagree with the characterization that the UIL Defendants did not question the Plaintiffs about the abuse allegations on invitation by the Plaintiffs' counsel to "ask [A.B.] what happened to him." After the closing statement, UIL Defendant Paul Galvan stated:

> I'd like to find out from the mother, the representative indicated that after—August the 21st evidently, is when the young man's father hit him or did whatever and so forth this nature. Then she began to get a restraining order against

---

[4] The Court also mentions that "when Jennifer tried to explain the nature of the abuse and how it prompted her decision to move, one UIL Defendant suggested that the panel was not going to give much weight to the subject matter." *Ante* at ___. But UIL Defendant Michael Motheral said, "It's our understanding that there was some—an abusive-type situation that's already been mentioned, and we—we're aware of that, and we're not gonna press you very hard on that issue. All right?" And after Jennifer provided a brief account of the assault, Motheral said, "Okay. Appreciate you getting that on the record for us. That's helpful." In my opinion, this statement could be interpreted as a desire not to "press" on a personal and traumatic event rather than an implication that the UIL Defendants were "not going to give much weight to the subject matter."

10

Mr. Black at that time. That's August the 21st. Is that correct? Is that what I heard?

Galvan and Jennifer then had an exchange regarding that event. Following this, UIL Defendant Michael Motheral then said, "Let's let [A.B.] talk." Then, both Jennifer and A.B. engaged in a back and forth with Galvan and Motheral about the events of the abuse at the tournament.

Second, as to the closing statement, the Plaintiffs' counsel began by saying, "I know you've been in a long meeting, and I'm certainly going to try to be sensitive of your time, but I think there are some really important things we have to address here." Motheral responded, "Let me address that part because we will want you to be succinct. This is not going to drag out for minutes and minutes for a long period of time. Be succinct." Then, the UIL Defendants allowed the Plaintiffs' counsel to speak for the equivalent of seven pages out of a forty-five-page hearing transcript before Motheral stated, "You've done a really nice job. We need to wrap up." The Plaintiffs' counsel then spoke for the equivalent of another two pages of the transcript before Motheral finally said, "Please wrap up. Please wrap up." The Plaintiffs' counsel then wrapped up the closing argument with a few final words.

Third, the Plaintiffs are correct that the UIL Defendants did not permit an opening statement in the SEC hearing, apparently in violation of UIL Rules.[5] Motheral began the hearing by describing the process:

> Process is very simple. We're going to begin with parents—and I want to make sure you attorneys understand this, we are here initially to talk to the family. So

---

[5] UIL Rule 100(c) provides that while parties appearing before the SEC "may be represented by legal counsel should they so desire, an attorney's role is limited to providing advice to their client(s) during the course of the hearing; requesting that the committee or hearing panel pose certain questions or lines of inquiry to another party or witness and to making opening and closing statements on behalf of their client(s)."

we will be asking questions directly to them. There will be a time, later on, where you will get an opportunity to speak.

But—and then once that's all done, we'll affirm information from the previous hearing and learn new information. Then we'll go to the sending school, which, in this case, is Coppell. We'll talk to them. We'll go then to Duncanville. And, typically, the receiving district doesn't have a great deal of information for us about the reason for the change, but we'll give you that opportunity.

We'll then go to the District Executive Committee Chair to get their input. And then after that, we go back to family, and we will maybe have some other questions. We'll give them an opportunity to summarize, and if they want one of their representatives to speak at that time, that'll be great. Okay. Very Good.

Even if the UIL Rules required the opportunity to make an opening statement, the Plaintiffs and their counsel nevertheless were provided other opportunities to be heard. I cannot conclude that the UIL Defendants' failure to provide the Plaintiffs' counsel with the opportunity to make an opening statement supports a valid ultra vires claim under the constitutional due course of law clause. *See Dearman v. Stone Cnty. Sch. Dist.*, 832 F.3d 577, 584 (5th Cir. 2016) ("To sustain the position that state-mandated procedures add to the federal constitutional minimum, one must show that the procedures promised [were] denied in such a manner that the constitutional minimum is itself denied or an independent constitutional deprivation is effected." (quoting *Whatley v. Philo*, 817 F.2d 19, 21 (5th Cir. 1987))); *Doe v. University of N. Tex. Health Sci. Ctr.*, No. 02-19-00321-CV, 2020 WL 1646750, at *6 (Tex. App.—Fort Worth Apr. 2, 2020, pet. denied) (mem. op.) ("If a party has received constitutionally adequate process, the claim for a violation of an internal or promised procedure falls into a different category of claim than a constitutional violation, such as a breach-of-contract or other state-law claim."); *Texas Tech Univ. Health Scis. Ctr. v. Enoh*, 545 S.W.3d 607, 624 n.13 (Tex. App.—El Paso 2016, no pet.) ("Dr. Enoh also emphasizes that Texas Tech did not follow its own policies in the appeal process. The procedural due process inquiry, however, focuses on what is constitutionally

12

required, and not whether particular written policies were followed."); *University of Tex. Med. School at Hous. v. Than*, 874 S.W.2d 839, 851 (Tex. App.—Houston [1st Dist.] 1994) ("[A] university's failure to follow its own rules and regulations is not a per se violation of due process. However, when a university's actions violate its own rules and also *in themselves* violate due process, there is a constitutional deprivation independent of the rules violations." (internal citations omitted; emphasis in original)), *aff'd as modified*, 901 S.W.2d 926 (Tex. 1995).

Here, the Plaintiffs do not complain of any lack of notice, and they received the opportunity to be meaningfully heard in two distinct hearings, in front of both the DEC and the SEC. *See Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex. 2001) (recognizing that Texas Constitution's "due course of law provision at a minimum requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner" (citing *Than*, 901 S.W.2d at 930)). And both the DEC and the SEC agreed that A.B. moved for athletic purposes. In my opinion, the Plaintiffs' allegations of due course of law violations in the SEC hearing, when understood in context and even under the "flexible standard" for determining what process is due, *see Than*, 901 S.W.2d at 930, do not give rise to a valid ultra vires claim that they received less process than that required under the Constitution, *cf. Villarreal*, 620 S.W.3d at 908 (concluding that plaintiff received "at least as much process as the Constitution required" as matter of law).

**PLEADED RELIEF**

Finally, the Plaintiffs pleaded the following relief for their due course of law claim: "The Court should enter an order declaring that the UIL Defendants deprived Plaintiffs of their due course of law rights, and enjoining Defendants from enforcing their ineligibility

13

decision against A.B." However, "the remedy for a denial of due process is due process," and an injunction that requests more than such relief "exceeds the proper remedy" and "represents unwarranted judicial interference with the educational process." *Than*, 901 S.W.2d at 933–34.

The Plaintiffs received process in the DEC hearing, and the DEC determined that A.B. was ineligible. The Plaintiffs did not sue the DEC members for violating their rights to due course of law nor have the Plaintiffs explained how the DEC hearing provided insufficient process under the Constitution. Without citing authority, they allege that the process they received at the DEC hearing is "irrelevant here" because "[t]he SEC hears appeals de novo." I question whether the Plaintiffs are correct in this proposition of law. Regardless, though, in my opinion this should have been a sufficient ground to deny the Plaintiffs' request for Rule 29.3 relief, as the status quo prior to the SEC hearing was that the DEC had determined A.B. moved for athletic purposes. And for the same reason, even if the Plaintiffs had alleged both a legitimate liberty interest implicated by the UIL ineligibility determination and a valid ultra vires claim based on violations of due course of law, the claim would not serve as the basis for the expansive injunctive relief granted by the district court and affirmed by this Court.

**CONCLUSION**

If this case is rendered moot or if the final judicial determination does not bar the UIL ineligibility determination, then under the UIL Rules, Duncanville High School will likely have to forfeit the athletic games in which A.B. participated.[6] In either scenario, our judicial

---

[6] UIL Rule 29(b)(3)(B), "Mandatory Forfeiture for Participation of an Ineligible Student Under Court Order," provides: "If a student who is finally determined to be ineligible participates in a UIL contest under a temporary or other court order, the District Executive Committee shall forfeit the contest." Thus, if the Plaintiffs are ultimately unsuccessful on the merits of this lawsuit or if the case is rendered moot prior to a final determination, then the

14

intervention into this UIL matter will have caused more harm than good, significantly affecting not only the litigants in this suit, but also nonlitigants, including Duncanville High School, A.B.'s teammates, and Duncanville's competitors. The Legislature chose not to provide judicial review of such UIL determinations, perhaps to avoid the very harms potentially caused here.

In considering whether judicial intervention is justified here, I cannot conclude that the Plaintiffs' alleged liberty interests implicated constitutional protection at all, let alone that the UIL determination "directly and sharply implicate[d] basic constitutional values," *see Yeo*, 171 S.W.3d at 870 (quoting *Epperson*, 393 U.S. at 104), or that the Plaintiffs alleged facts demonstrating that they did not receive "at least as much process as the Constitution required," *see Villarreal*, 620 S.W.3d at 908. Accordingly, I respectfully dissent to the extent that the Court concludes that the district court had jurisdiction over Plaintiffs' claims.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Triana

Filed: May 6, 2022

---

athletic ineligibility determination will likely control and the UIL Rules appear to mandate that the DEC forfeit the contests in which A.B. participated.